[No. D026752. Fourth Dist., Div. One. Jan. 27, 1998.]

MARK W. IKE, Plaintiff and Appellant, v.
G. ARNOLD DOOLITTLE, Defendant and Respondent;
SAM ARNOLD et al., Defendants and Appellants.

COUNSEL

Burkhart & Larson and Philip Burkhardt for Plaintiff and Appellant.

Wild, Carter & Tipton, Wesley J. Hammond and Richard A. Harris for Defendants and Appellants.

Olmstead, Hughes & Garrett, Ralph E. Hughes, Wingert, Grebing, Anello & Brubaker, Alan K. Brubaker, Craig Gross and James J. Brown for Defendant and Respondent.

OPINION

NARES, J.—

## INTRODUCTION

This case requires us to independently interpret language in both a declaration of trust (the Trust) which created an inter vivos trust known as the Ike Family Trust, and in a related property agreement (Property Agreement) contemporaneously executed by trustors Virgil W. Ike (Virgil) and his wife

Jeannette B. Ike (Jeannette), both of whom are deceased.[1] Following the death of Virgil, who had survived Jeannette, disputes arose among the trustors' respective designated beneficiaries and Jeannette's intestate heirs over distribution of the trust estate.

This matter arose from three consolidated petitions for construction of the trust instruments and a determination of how the trust property should be distributed. (Prob. Code,[2] §§ 17200, subd. (b), 17201, & 17206.) Mark W. Ike (Mark), who is Virgil's son and one of Virgil's designated beneficiaries, brought the first petition claiming the Trust is unambiguous and the entire trust estate should be distributed to him and his brother Robert (the only other beneficiary named by Virgil).

Successor trustee G. Arnold Doolittle (Doolittle), who is one of Jeannette's designated beneficiaries, filed the second petition claiming the Trust is ambiguous in that it fails to provide for distribution of Jeannette's share of the trust estate in the event (as actually occurred) she died first. Doolittle argued the Trust should be interpreted in a manner that distributes Jeannette and Virgil's shares of the trust estate to their respective designated beneficiaries under article nine of the Trust regardless of whether Jeannette or Virgil died first.

Finally, Jeannette's intestate heirs Sam Arnold, Beverly Grande, James Arnold and Harriet Sheldon (together, the Heirs) filed the third petition claiming Jeannette's share of the trust estate should be distributed to them under the residuary clause in section 5 of article nine of the Trust because Jeannette predeceased Virgil and the Trust failed to provide for the distribution of her share of the estate in the event she died first.

After finding the Trust was ambiguous in that it did not expressly provide for the distribution of Jeannette's share of the trust estate in the event she died before Virgil, the court resolved the ambiguity by admitting and considering extrinsic evidence as to the circumstances surrounding the execution of the Trust and as to serious drafting errors. Upon finding the trustors intended their respective shares of the estate to pass to their designated beneficiaries upon the death of the surviving trustor, the court entered a judgment reforming articles four and nine of the Trust to give effect to the trustors' intentions, granted the relief requested in Doolittle's petition, and denied the relief requested by Mark and the Heirs. Mark and the Heirs separately appeal from the judgment.

We construe the Trust and Property Agreement de novo and conclude there is a patent ambiguity in these instruments as to whether Jeannette and

---

[1] We shall occasionally refer to Jeannette and Virgil collectively as the trustors.
[2] Subsequent statutory references are to the Probate Code unless otherwise specified.

Virgil transmuted all their separate property into community property, as Mark contends, or whether their separate property retained its character as such, as Doolittle contends. We further conclude the Trust is patently ambiguous as to whether the trustors revoked the residuary clause in section 5 of article nine under which the Heirs claim that Jeannette's share of the trust estate should be distributed to them.

Because the Trust is patently ambiguous with regard to the characterization of the trustors' property and whether the trustors revoked the residuary clause in article nine, we further conclude the court properly found the Trust is patently ambiguous with respect to sections 1 and 2 of article nine which provide for the distribution of each trustor's separate property and one-half interest in community property to designated beneficiaries. We further conclude the court properly admitted and considered extrinsic evidence to resolve the ambiguities evident in the Trust and the Property Agreement; it correctly found the Property Agreement did not transmute the trustors' separate property to community property; and it did not err in reforming section 1, paragraph (d) of article four (governing the revocability of the Trust) and sections 1 and 2 of article nine (governing distribution of the trust estate).

Finally, we conclude substantial evidence supports the court's findings regarding the tracing and characterization of Jeannette's separate property. Accordingly, we affirm the judgment.

## CONTENTIONS

Mark contends (i) the Trust is unambiguous, and (ii) the court erroneously admitted extrinsic evidence after determining the Trust is patently ambiguous as to the distribution of each trustor's separate property and one-half interest in the community property after the death of the surviving trustor. Mark also contends (iii) the court improperly rewrote the provisions set forth in the Trust in section 1, paragraph (d), of article four (governing the power of the trustee to amend or revoke the Trust) and sections 1 and 2 of article nine (governing distribution of the trust property upon the death of the surviving trustor) in a manner that permits distribution of Jeannette and Virgil's respective shares of the trust estate to the beneficiaries they separately named in article nine.

Mark further asserts that (iv) when Virgil and Jeannette executed the Trust they also executed a Property Agreement which transmuted all of their separate property into community property; (v) under various provisions of the Trust, the entire trust estate became Virgil's separate property when

Jeannette predeceased him and thus the entire estate must be distributed to Virgil's named beneficiaries (Mark and his brother Robert); and (vi) the court erred in its "tracing" of stock and cash assets and apportionment of the trust estate.

The Heirs agree with Mark's contentions that the Trust is unambiguous and the court improperly reformed the Trust after erroneously admitting extrinsic evidence. The Heirs contend, however, that Jeannette's separate property and her one-half share of the community property did not become Virgil's separate property upon her death, and her share of the trust estate should pass to them under the residuary clause in section 5 of article nine of the Trust, and under the laws of intestate succession, because the provisions of the Trust governing distribution of Jeannette's share of the estate to her named beneficiaries (art. nine, § 2) contained an express condition of survivorship which failed when Jeannette predeceased Virgil.

## FACTUAL BACKGROUND

The trustors, Virgil and Jeannette, were married in 1976. Both had been previously married. Virgil, who was then approximately 65 years old, had 2 children by his prior marriage: appellant Mark and Robert E. Ike (who is not a party to these appeals). Jeannette, who was approximately 75 years old when she married Virgil, had 3 siblings, all of whom predeceased her. Jeannette had one daughter, who died at a young age without leaving any issue. There were no children of the marriage between Virgil and Jeannette. At the time of their marriage, Jeannette's separate property assets were considerable and Virgil's were rather nominal by comparison. Doolittle is one of Jeannette's grandnephews.

### A. Creation and Structure of the Trust

Virgil and Jeannette created the Trust, a revocable inter vivos trust, on November 1, 1988, when they executed the declaration of trust. The Trust and related estate planning documents were drafted by Attorney Thomas McGrath. The Trust provided that Virgil and Jeannette would serve as cotrustees during their joint lifetimes, and the survivor would then serve as the sole trustee. Respondentt Doolittle was designated as the successor trustee who would replace the surviving trustor upon his or her death, resignation or disability.

The community property held by Jeannette and Virgil at the time they executed the Trust consisted of cash assets in the total sum of $241,160. Jeannette's separate property at that time consisted of various parcels of real

property (her residence at 3955 Garfield Street in Carlsbad and a parcel located at 3971 Garfield Street (together, the Garfield property), and two parcels in Landers, California) plus funds held in various certificate of deposit accounts in the amount of $343,259. Virgil's separate property consisted of funds in a money market account in the sum of $30,020.

Thus, when they executed the Trust in November 1988 Jeannette and Virgil had total cash holdings in the sum of $614,439. Of this amount, 39.25 percent ($241,160) was community property, 55.87 percent ($343,259) was Jeannette's separate property, and 4.89 percent ($30,020) was Virgil's separate property.

 1. *Character of the trust property (art. two, §§ 2 and 3; and the Property Agreement)*

Upon its creation the inter vivos trust was funded with the separate and community property of the trustors (Jeannette and Virgil) as shown by article two, section 2 ("Trust Estate"), of the Trust:

"The 'Trust Estate' consists of property interests of all kinds transferred to the Trust by the Trustors or any other person. The property interests of the Trustors shall be set forth on the following schedules:

"SCHEDULE A: COMMUNITY PROPERTY OF TRUSTORS

"SCHEDULE B: SEPARATE PROPERTY OF HUSBAND

"SCHEDULE C: SEPARATE PROPERTY OF WIFE[.]"

The Trust expressly stated that all property made part of the trust estate would retain its separate or community character. Specifically, section 3 ("Character of Trust Property") of article two provided in part: "Any property conveyed or distributed to, or in any manner received by the Trust shall retain its separate or community character. . . ."

However, the same day they executed the Trust Jeannette and Virgil also executed a Property Agreement that appeared to indicate they had agreed to transmute all their separate property into community property. The second and third recitals set forth on page one of the Property Agreement stated:

"WHEREAS, the parties own, hold and possess property which is taken or held partially in the name of VIRGIL K. IKE, partially in the name of JEANNETTE B. IKE, and partially in the names of both parties, either as joint tenants or otherwise; and

"WHEREAS, *the parties desire to come to an agreement and do hereby transfer, assign and convey all such property to themselves as community property.*" (Italics added.)

Other provisions in the Property Agreement, however, appeared to indicate no such transmutation into community property was intended. For example, section 3 ("Purpose of Agreement") of the Property Agreement provided in part: "The purpose of this Agreement is to clarify the status of the property held by the parties and *shall not affect a gift from either party to the other or any interest in properties held by either party. . . .*" (Italics added.) Section 1 ("Joint Tenancy Property") of the Property Agreement stated: "*It is the intent of the parties that all community and separate property be held by the part[ies]' inter vivos family trust.* However, all assets whose title has not specifically been registered into the part[ies]' family trust shall be held by the parties in joint tenancy with right of survivorship[.] [¶] It is agreed by the parties hereto that the above-referenced assets are held in joint tenancy for the limited purpose of avoiding probate administration in the event of the death of one of the parties. It is agreed that the true nature of such assets held in such form shall be community property." (Italics added.)

 2. *Provision for division of the Trust into Trusts A (Survivor's Trust) and B (Decedent's Trust) upon the death of the first trustor to die (art. six, § 1)*

Section 1 ("Division of Trust Property") of article six of the Trust provided that upon the death of the first trustor to die the trust would divide into two separate trusts: Trust A (denominated the Survivor's Trust) and Trust B (the Decedent's Trust). The primary purpose of an A-B trust such as this was the avoidance of estate taxes.

Trust A was to receive all of the surviving spouse's separate property and his or her one-half interest in the community property. Specifically, the Trust provided in paragraph (a) ("Creation of Trust 'A' (Survivor's Trust)") of section 1 of article six that "[t]here shall be allocated to Trust 'A' all of Surviving Trustor's separate property and property equal in value to the Surviving Trustor's interest in the community property."

Trust B was to hold a portion of the deceased trustor's estate to a maximum value of $600,000, the largest amount that would not result in the imposition of the federal estate tax on the decedent's estate after allowing for the unified estate tax credit.

After the funding of Trust B (the Decedent's Trust), Trust A (the Survivor's Trust) was to hold the remainder of the trust estate to be passed to the surviving trustor under shelter of the federal estate tax marital deduction. Article six, section 1, paragraph (c) ("Maximum Marital Deduction Value to Trust 'A' ") of the Trust required that the trustee take full advantage of the marital deduction and only select for distribution to Trust A ". . . assets eligible for the Marital Deduction."

### 3. *Revocability of the Trust (art. four, § 1, par. (d))*

Typically, for the trustors of an A-B inter vivos trust to take advantage of the federal estate tax exemption available under the unified credit, the Decedent's Trust (Trust B) must be irrevocable to prevent the assets it holds from being included in the taxable estate of the surviving trustor. Here, however, the Trust contained a provision which expressly reserved to the surviving trustor the power to revoke or amend "the Trust." Specifically, paragraph (d) ("Amend and Revoke the Trust") of section 1 of article four provided in part: ". . . After the death of the first Trustor, . . . so long as the Surviving Trustor is competent, he or she shall have the power to revoke or amend the Trust." As a result of a drafting error, this provision governing the surviving trustor's power of revocation made no distinction between the Trust as an entire document and the subtrusts set up in the A-B format under the provisions of article six, section 1 (discussed *ante*).

### 4. *Surviving trustor's broad power of appointment regarding the property in Trust A (art. seven, § 1, par. (e))*

Under article seven, section 1, paragraph (e) ("The Surviving Trustor's General Power of Appointment"), the Trust gave the surviving trustor ". . . the unlimited and unrestricted general power to appoint, by a valid last will and testament, or by a Trust Agreement . . . the entire principal and any accrued and undistributed net income of Trust 'A' as it exists at the Surviving Trustor's death."

### 5. *Provision for merger of Trust B into Trust A upon the surviving trustor's death (art. eight, § 6)*

The Trust provided for the termination of Trust B (the Decedent's Trust) upon the death of the surviving trustor, but as a result of another drafting

error the Trust also provided for the merger of Trust B into Trust A (the Survivor's Trust), thereby making the assets in terminated Trust B part of the surviving trustor's estate. Specifically, section 6 ("Termination and Merger of Trust 'A' and Trust 'B'") of article eight of the Trust provided: "Upon the death of the Surviving Trustor, Trust 'B' shall terminate and the undistributed net income and principal of Trust 'B' shall be merged with the undistributed net income and principal of Trust 'A' . . . ."

6. *Provisions for distribution of the trust property upon the death of the surviving trustor (art. nine, §§ 1 and 2)*

The key provisions of the Trust governing the distribution of the trust estate following the death of the surviving trustor were set forth in sections 1 and 2 of article nine. Article nine was titled "Distribution Upon the Death of Surviving Trustor." As we shall discuss, sections 1 and 2 of article nine contained serious drafting errors which led directly to the litigation that is the subject of these appeals.

Section 1 of article nine, as originally drafted, provided that "if [Virgil] is the Surviving Trustor," upon his death his separate property and his one-half interest in the community property would be distributed in equal shares to his two named beneficiaries: his sons Mark and Robert.[3] As the result of a drafting error section 1 appeared to indicate an intention that Virgil's share of the trust estate should be distributed to Mark and Robert only if Jeannette predeceased Virgil. In fact, the trustors intended that the successor trustee distribute Virgil's share of the estate to his named beneficiaries upon the death of the surviving trustor, regardless of whether Jeannette or Virgil was the last to die. However, this drafting error was of no lasting consequence because Jeannette in fact did predecease Virgil.

Section 2 of article nine (which is at issue in these appeals) provided that "if [Jeannette] is the Surviving Trustor," upon her death her separate

---

[3]Section 1 of article nine provided in part:

"SECTION 1. IF VIRGIL W. IKE IS THE SURVIVING TRUSTOR

"Upon the death of VIRGIL W. IKE, if he is the Surviving Trustor, Trustee(s) shall distribute all of his separate property and his one-half (½) interest in the community property as follows:

| BENEFICIARY | RELATIONSHIP | AMOUNT |
|---|---|---|
| "MARK W. IKE | SON | 50% |
| "ROBERT E. IKE | SON | 50%" |

property and her one-half interest in the community property would be distributed in specified shares to 11 named beneficiaries.[4] Doolittle (a nephew of Jeannette and the designated successor trustee) was named as a beneficiary to whom 10 percent of Jeannette's share of the trust estate would be distributed if Jeannette was the surviving trustor.

As the result of a drafting error, the express language in section 2 appeared to indicate an intention that Jeannette's share of the trust estate be distributed to her named beneficiaries, including Doolittle, only if she survived Virgil. In fact, Jeannette and Virgil intended that the successor trustee distribute Jeannette's share of the estate to her named beneficiaries upon the death of the surviving trustor, regardless of whether Jeannette or Virgil was the last to die.

As a result of another drafting error, article nine failed to specify how Jeannette's share of the trust estate was to be distributed if Jeannette predeceased Virgil and Virgil became the surviving trustor.[5]

As we shall discuss, these drafting errors became significant when upon Virgil's death Doolittle, in his capacity as the successor trustee, was called upon to distribute the trust estate.

### 7. *The intestacy clause (art. nine, § 5)*

Section 5 of article nine of the Trust was an intestacy clause that provided for the intestate distribution of any portion of the trust estate not disposed of under the other sections of article nine. Specifically, section 5 ("Distribution In the Event All Named Beneficiaries Are Deceased") provided: "Any of the Trust Estate not disposed of under the foregoing provisions shall be distributed to the legal heirs of each Trustor according to the laws of intestate succession. . . ."

---

[4]Section 2 of article nine provided in part:

"SECTION 2. IF JEANNETTE B. IKE IS THE SURVIVING TRUSTOR

"Upon the death of JEANNETTE B. IKE, if she is the Surviving Trustor, Trustee(s) shall distribute all of her separate property and her one-half (½) interest in the community property as follows:

| "BENEFICIARY | RELATIONSHIP | AMOUNT |
|---|---|---|
| "G. ARNOLD DOOLITTLE | NEPHEW | 10%. . . ." |

[5]The Heirs rely on this omission in contending Jeannette's share of the trust estate should be probated and distributed to them under the laws of intestate succession. Mark relies on the same omission and various other provisions of the Trust in contending Jeannette's share of the estate became Virgil's separate property upon Jeannette's death, and thus should be distributed to him (Mark) and his brother in equal shares.

## B. *First Amendment to the Trust*

On October 11, 1990, almost two years after the creation of the inter vivos trust and only about two months before Jeannette's death on December 15, 1990, Jeannette and Virgil executed the "First Amendment Dated October 11, 1990 To the Ike Family Trust" (hereafter, First Amendment). The First Amendment expressly purported to amend article nine (discussed *ante*).

The introductory paragraph of the First Amendment stated: "EFFECTIVE THIS 11th day of October, 1990, *Article Nine* of the Ike Family Trust dated November 1, 1988, *shall be amended to read as follows*: . . . ." (Italics added.) Following this introductory paragraph, the First Amendment only set forth section 1 ("If Virgil W. Ike Is the Surviving Trustor") as it was originally drafted, and a revised version of section 2 (but still titled "If Jeannette B. Ike Is the Surviving Trustor"). The First Amendment was silent with respect to the remaining three sections originally set forth in article nine (§§ 3, 4, and 5 [the intestacy clause, discussed *ante*]).

The First Amendment did not alter the relevant portions of section 1 (discussed *ante*), which continued to provide that if Virgil was the surviving trustor, upon his death his separate property and his one-half interest in the community property would be distributed in equal shares to his two named beneficiaries, his sons Mark and Robert.

The First Amendment did alter section 2 of article nine, which pertained to the distribution of Jeannette's share of the trust estate. Section 2 was amended to (among other things) delete one of the named charity beneficiaries, and increase the gift to Doolittle from 10 percent to 50 percent of Jeannette's share of the trust estate. However, the First Amendment did not alter the relevant general provisions of section 2 (discussed *ante*), which continued to provide that if Jeannette was the surviving trustor, upon her death her separate property and her one-half interest in the community property would be distributed in specified amounts to her named beneficiaries.

The First Amendment contained no express language to clearly indicate whether the trustors intended to amend article nine in its entirety, thereby effectively revoking the intestacy clause in section 5 (discussed *ante*) by making no reference to it, or whether the trustors intended to amend sections 1 and 2 only, thereby leaving intact the intestacy clause in section 5 as originally drafted.

C. *Jeannette's Death on December 15, 1990, and Resulting Division of the Trust Into Trust A (Survivor's Trust) and Trust B (Decedent's Trust)*

Jeannette died on December 15, 1990, at the age of 89 years, leaving no surviving issue. Jeannette's siblings had all predeceased her, and her various intestate heirs consisted of the children or grandchildren of her siblings.

Upon Jeannette's death, under the terms of the Trust (art. six, § 1) the Trust was divided into two subtrusts: Trust A (the Survivor's Trust) and Trust B (the Decedent's Trust). Trust B was funded with Jeannette's separate property assets and a portion of her share of the community property assets in the amount of $600,000, the maximum sum that would not result in the imposition of the federal estate tax on Jeannette's share of the estate after allowing for the unified estate tax credit. The specific assets placed in Trust B were listed in Schedule A attached to the "Declaration of Funding of B Trust" executed by Virgil. The remainder of the trust estate was placed into Trust A.

D. *Second Amendment to the Trust*

On April 16, 1991, Virgil executed the "Second Amendment to the Ike Family Trust," which appointed Doolittle as Virgil's cotrustee, and changed the official title of the Ike Family Trust to reflect the death of Jeannette and the appointment of Doolittle.[6]

E. *Virgil's Death and Resulting Merger of Trusts A and B*

Virgil died on June 7, 1994, at the age of about 83 years. According to the terms of the Trust set forth in article eight, section 6 ("Termination and Merger of Trust 'A' and Trust 'B' "), Trust B terminated upon Virgil's death and Trusts A and B merged back into one trust. These same provisions of the Trust required that the undistributed net income and principal of Trust B be merged with the undistributed net income and principal of Trust A. The trust assets were then to be distributed by trustee Doolittle under the provisions of article nine of the Trust.

---

[6]The official title of the Trust was changed from "VIRGIL W. IKE and JEANNETTE B. IKE, Co-Trustees, UDT dated NOVEMBER 1, 1988 FBO THE IKE FAMILY" to "VIRGIL W. IKE and G. ARNOLD DOOLITTLE, CO-TRUSTEES U/D/T dated NOVEMBER 1, 1988 F/B/O THE IKE FAMILY."

PROCEDURAL BACKGROUND

A. *Consolidated Petitions for Trust Construction Filed by Mark, Doolittle, and the Heirs*

Following Virgil's death, a dispute arose between Mark (as one of the two beneficiaries named by his father, Virgil) and Doolittle (as both the successor trustee and the principal beneficiary named by Jeannette) concerning the construction of the terms of the Trust, particularly the distributive provisions of article nine. Mark filed a petition for construction of the Trust, seeking a judicial determination as to whom the trust estate should be distributed.

In his petition, Mark contended none of the trust assets should be distributed to Jeannette's designated beneficiaries (including Doolittle) under article nine, section 2 ("If Jeannette B. Ike Is the Surviving Trustor"), because Jeannette predeceased Virgil and thus she was not the "Surviving Trustor." Mark prayed for a judicial determination that he and his brother Robert are the sole beneficiaries of the entire trust estate.

Four months later Doolittle filed his own petition for construction of the Trust, arguing the Trust contained an ambiguity in that article nine failed to specify how Jeannette's separate property and her one-half interest in the community property were to be distributed if (as actually occurred) Jeannette did not survive Virgil. Doolittle also argued Jeannette and Virgil intended that, at the death of the survivor no matter who survived the other, the portion of the trust estate that had consisted of Jeannette's separate property and her share of the community property should be distributed to her named beneficiaries as if she had survived Virgil, and the portion of the trust estate that had been Virgil's separate property and his share of the community property should be distributed to his named beneficiaries as if he had survived Jeannette.

Doolittle further asserted the trustors did not intend to permit the surviving trustor to revoke Trust B (the Decedent's Trust) after the death of the first trustor to die, and that the survivor's power of revocation was limited to Trust A (the Survivor's Trust) only. Doolittle prayed for a judicial determination that (1) Jeannette's share of the trust estate was distributable to her designated beneficiaries as provided in section 2 of article nine of the Trust; (2) Virgil's share of the trust estate was distributable to his beneficiaries as provided in section 1 of article nine of the Trust; (3) the Property Agreement executed by Jeannette and Virgil on November 1, 1988, did not convert either trustor's separate property into community property or joint tenancy property; (4) Virgil had no power to amend Trust B after Jeannette's death;

and (5) Virgil had a general power of appointment over Trust A only, which he did not exercise.

The Heirs thereafter filed their own petition for construction of the Trust, contending sections 1 and 2 of article nine of the Trust did not provide for the distribution of the separate property and one-half share of the community property of the trustor who died first. Relying on the intestacy clause set forth in section 5 of article nine (discussed *ante*), the Heirs prayed for an order compelling Doolittle as the trustee to distribute Jeannette's share of the trust estate to them under the laws of intestate succession.

### B. *The Bench Trial*

All three petitions were consolidated, and the matter was set for a bench trial which commenced on April 8, 1996, and concluded on April 15, 1996. After making a preliminary finding that the gifting provisions of article nine appeared to be ambiguous when considered in light of the entire Trust, the court ruled it would receive extrinsic evidence.

The court admitted and considered numerous documents, and heard testimony from six witnesses: Thomas McGrath (the attorney who drafted the trust and who was called on behalf of Doolittle), Jack Charney (an expert called on behalf of Doolittle, individually), Miles Hansen (whose deposition testimony was offered by Doolittle), Doolittle, Kent Hildreth (an expert called on Mark's behalf), and Clifton Schoedl, Jr. (an attorney called on behalf of Mark). While we do not attempt here to summarize all of the material statements made by these witnesses, we note some of their more important statements.

Thomas McGrath, the drafter of the Trust, testified that under his custom and practice he received from Jeannette and Virgil a listing of Jeannette's separate property, Virgil's separate property, and their "joint" property, and his office used this information to prepare schedules A, B and C. Jeannette never expressed to him a desire that her assets should pass to Virgil's heirs if she predeceased him. Jeannette and Virgil told him that upon their death Jeannette wanted her assets to go to a series of relatives and charities, and Virgil wanted his share of the estate to go to his two sons. McGrath also testified that in drafting the Trust it was his intent to accomplish what Jeannette and Virgil wanted, but as a result of his drafting errors article nine did not accomplish what they intended, and he ". . . should have just said upon the death of the survivor, whoever it . . . might be, Virgil's share goes this way [and] Jeannette's goes that way. . . ." The Property Agreement also contained a drafting error in that contrary to Jeannette and Virgil's intent it stated that all of their separate property was to be converted into community property. The only purpose of the Property Agreement was to

assure that any property "held jointly, for example, in joint tenancy was to be treated as community property so that in the event one of them died the other one would get a full step up in tax basis."

McGrath also testified that as a result of another drafting error he failed to include a provision in the Trust making Trust B (the Decedent's Trust) irrevocable.

Jack Charney, an expert called on behalf of Doolittle in his individual capacity, stated his opinion that tax savings was a goal of the trustors, but due to a drafting error which provided for the merger of Trust B into Trust A the tax savings goal would be met only if the Trust were reformed so as to be consistent with the trustors' intent by (1) deleting the language which allowed the survivor to amend or revoke Trust B (art. four, § 1, par. (d)), and (2) reversing the language in the merger clause (art. eight, § 6) which provided for the merger of Trust B into Trust A. Charney also testified without objection it was his opinion that Jeannette and Virgil did not intend the disposition of their respective shares of the trust estate would depend on who died first, but rather they intended their respective beneficiaries to receive certain assets.

Miles Hansen testified Virgil had stated he had no claim to Jeannette's property and they wanted to retain the separateness of their property, and Jeannette wanted her property to go to the beneficiaries she designated.

Doolittle testified Jeannette wanted her separate property to remain separate, and Virgil wanted "nothing to do" with Jeannette's property. Following Jeannette's death in December 1990, he and Virgil jointly prepared the list of trust assets which was admitted into evidence marked as exhibit 75. Doolittle further testified to the manner in which he prepared the tracing of trust cash assets admitted into evidence marked as exhibit 154.

Kent Hildreth (Mark's expert) testified during cross-examination that the Property Agreement executed by Jeannette and Virgil was ambiguous and conflicted with the characterization of their property set forth in schedules A through C. He further testified the merger clause in the Trust was a drafting mistake in that it did not state Trust B (the Decedent's Trust) would be irrevocable.

Hildreth also stated his opinion that the drafting of article nine of the Trust was poor. When asked whether it was inconceivable that anyone would design a document that included an article nine provision that failed to take care of the assets that were to be placed in trust and disbursed out of the trust, Hildreth responded the drafter is typically hired to make a disposition of the assets.

During redirect examination Hildreth testified article nine was ambiguous as to whether certain sections, including section 5 ("Distribution in the Event All Named Beneficiaries Are Deceased"), had been deleted by the First Amendment. Hildreth stated he did not find an ambiguity in the fact that Jeannette's share of the estate was not disposed of.

Clifton Schoedl, Jr., an attorney who was familiar with the Trust, testified he had spoken to Virgil about the article nine drafting problems, and had pointed out certain ambiguities. Schoedl warned Virgil that the Trust as drafted would result in "a big mess and a fight," but Virgil did not want to change it.

### C. The Trial Court's Findings and Judgment

The court issued a written 21-page statement of decision which set forth its factual and legal findings. The court first found the Trust was patently ambiguous ". . . as to the distribution of the Trust after the death of the surviving Trustor, when terms and provisions of the entire document, as well as its purpose, are considered." Specifically, this patent ambiguity related to the distribution of each trustor's separate property and one-half interest in the community property.

The court confirmed its pretrial ruling that because the Trust was patently ambiguous it was proper for the court to consider extrinsic evidence to resolve the ambiguity and ". . . determine, if possible, the intent of the Trustors regarding disposition of this property." The court noted that when interpreting a trust it is proper for the court to consider the circumstances under which the document was made ". . . so that the Court may be placed in the position of the Trustor."

The court next found the evidence relating to the purpose and circumstances surrounding the creation of the Trust established Jeannette and Virgil believed the Trust and related documents would fully and completely dispose of their respective separate and community property to the beneficiaries they each had designated in the Trust. The court noted that the specific references in article nine to each trustor's separate property and one-half interest in the community property ". . . strongly suggests the intent of the Trustors was not to have all the property pass to the survivor upon the death of the first Trustor . . . ." The court found such intent was established by the extrinsic evidence, noting that the trustors' detailed description and designation in article nine of their respective beneficiaries strongly suggested an intent that upon the death of the survivor the separate property and community property interest of each trustor would pass to each trustor's designated beneficiaries.

As a separate and independent basis for adjudication of the trust estate distribution issues raised by the pleadings, the court found that clear and convincing evidence established that article nine contained "serious drafting errors" which if left intact would conflict with the trustors' actual intent.

Under the authority of Civil Code section 3399[7] and through the exercise of its equitable powers the court reformed sections 1 and 2 of article nine to give effect to the trustors' actual intention that their respective separate property and one-half interest in the community property pass to their respective designated beneficiaries upon the death of the survivor. Specifically, the court revised section 1 of article nine to provide in part as follows (for purposes of comparison the original text appears in the right-hand column):

*Reformed Text*

"ARTICLE NINE

"DISTRIBUTION UPON THE DEATH OF SURVIVING TRUSTOR

"SECTION 1. *DISTRIBUTION OF VIRGIL W. IKE'S SEPARATE PROPERTY AND ONE-HALF (½) INTEREST IN COMMUNITY PROPERTY*[8]

"Upon the death of *the Surviving Trustor*, \*\*\*[9] Trustee(s) shall distribute all of \*\*\* *VIRGIL W. IKE'S* separate property and his one-half (½) interest in the community property as follows: . . . ."

(Remaining text is unchanged.)

*Original Text*

"ARTICLE NINE

"DISTRIBUTION UPON THE DEATH OF SURVIVING TRUSTOR

"SECTION 1. IF VIRGIL W. IKE IS THE SURVIVING TRUSTOR

"Upon the death of VIRGIL W. IKE, if he is the Surviving Trustor, Trustee(s) shall distribute all of his separate property and his one-half (½) interest in the community property as follows: . . . ."

(As in the original text.)

The court revised section 2 of article nine to provide in part as follows:

---

[7]Civil Code section 3399 provides: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value."

[8]Additions or changes are indicated by bolding italics.

[9]Deletions are indicated by bolded asterisks.

*Reformed Text*

"SECTION 2. DISTRIBUTION OF JEANNETTE B. IKE'S SEPARATE PROPERTY AND ONE-HALF (½) INTEREST IN COMMUNITY PROPERTY

"Upon the death of *the Surviving Trustor*, \*\*\* Trustee(s) shall distribute all of \*\*\* JEANNETTE B. IKE'S separate property and her one-half (½) interest in the community property as follows: . . . ."

*Original Text*

"SECTION 2. IF JEANNETTE B. IKE IS THE SURVIVING TRUSTOR

"Upon the death of JEANNETTE B. IKE, if she is the Surviving Trustor, Trustee(s) shall distribute all of her separate property and her one-half (½) interest in the community property as follows: . . . ."

(As in the original text.)

We note the title of article nine—"Distribution Upon the Death of Surviving Trustor"—remained unchanged.

Noting that clear and convincing evidence established that the Trust was revocable because of a drafting error in article four, and that many of the provisions of the Trust made sense only if Trust B (the Decedent's Trust) was irrevocable, the court found Jeannette and Virgil created the Trust to avoid probate, minimize estate taxes, and take full advantage of the estate tax marital deduction. The court further found the extrinsic evidence established that Jeannette and Virgil intended Trust B to be irrevocable to accomplish their estate planning goals. To give effect to the trustors' intentions, the court exercised its equitable powers and reformed section 1, paragraph (d), of article four ("Administration of the Trust While Both Trustors Are Alive") of the Trust as follows:

*Reformed Text*

"d. Amend and Revoke the Trust.

"The Trustors, during their joint lifetimes, shall have the absolute right to revoke or amend this Trust, in whole or in part, at any time. Any amendment or revocation must be in writing and delivered to the Trustee(s). After the death of the first Trustor, at any time or times, so long as the Surviving Trustor is competent, he or she shall have the power to revoke or amend \*\*\* *Trust 'A' only. After the death of the first Trustor, Trust 'B' is irrevocable.*"

*Original Text*

"d. Amend and Revoke the Trust.

"The Trustors, during their joint lifetimes, shall have the absolute right to revoke or amend this Trust, in whole or in part, at any time. Any amendment or revocation must be in writing and delivered to the Trustee(s). After the death of the first Trustor, at any time or times, so long as the Surviving Trustor is competent, he or she shall have the power to revoke or amend the Trust."

The court made numerous other findings, including, but not limited to, the following: Virgil never had power to revoke or amend Trust B or to appoint the disposition of the assets of Trust B; Jeannette and Virgil did not intend the merger clause in article eight, section 6, to grant the surviving trustor any power to control distribution of the undistributed net income and principal of Trust B; they did not intend the merger clause to transmute the property in Trust B into either separate property or community property of the surviving trustor; Virgil's power to revoke Trust A (the Survivor's Trust) did not result in Jeannette's separate property and her one-half interest in the community property in Trust A becoming his separate property or community property; and the Property Agreement that Jeannette and Virgil signed on the same day they executed the Trust was not a sufficient writing to transmute their respective separate property to community property.

The court adopted Doolittle's efforts at tracing the trustors' separate and community property from the date the Trust was executed to the date of Jeannette's death. The court found that of the cash assets on the date of Jeannette's death ($698,668.42), 41.86 percent ($292,465.89) was community property, 53.35 percent ($372,746.55) was Jeannette's separate property, and 4.79 percent ($33,455.98) was Virgil's separate property.

Finally, the court instructed Doolittle as the successor trustee to (1) distribute the noncash assets of Jeannette and Virgil to the beneficiaries designated by them in article nine of the Trust; and (2) to utilize the percentages of cash assets existing on the date of Jeannette's death to determine the amount of community property, separate property of Jeannette, and separate property of Virgil to be distributed to their respective beneficiaries.

## DISCUSSION

Although Mark and the Heirs appeal on some identical grounds, they also raise separate issues. Accordingly, we separately address their appeals.

### I. Mark's Appeal

#### A. The Court Properly Admitted and Considered Extrinsic Evidence to Resolve Patent Ambiguities in the Trust and Property Agreement

Mark contends the Trust is unambiguous, and the court erroneously admitted extrinsic evidence after determining the Trust is patently ambiguous as to the distribution of each trustor's separate property and one-half interest in the community property after the death of the surviving trustor. Mark also contends the court improperly rewrote the provisions set forth in

the Trust in (1) sections 1 and 2 of article nine (governing distribution of the trust property upon the death of the surviving trustor) in a manner that permits distribution of Jeannette and Virgil's respective shares of the trust estate to the beneficiaries they separately named in article nine; and (2) section 1, paragraph (d), of article four (governing the power of the trustee to amend or revoke the Trust). We disagree.

### 1. *Guiding principles governing interpretation of the trust instruments*

As we noted in our Introduction, *ante*, this case requires us to independently interpret language in both the Trust and the related Property Agreement. ■ In *Wells Fargo Bank* v. *Marshall* (1993) 20 Cal.App.4th 447 [24 Cal.Rptr.2d 507], we discussed the legal principles which guide our de novo interpretation of these instruments:

" ' "The interpretation of a written instrument, including a . . . declaration of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue. [Citations.]" [Citations.]' (*Scharlin* v. *Superior Court* (1992) 9 Cal.App.4th 162, 168 [11 Cal.Rptr.2d 448].) ■ 'In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it. [Citation.]' (*Ibid.*)

"In interpreting a document such as a trust, it is proper for the trial court in the first instance and the appellate court on de novo review to consider the circumstances under which the document was made so that the court may be placed in the position of the testator or trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect. (*Estate of Russell* (1968) 69 Cal.2d 200, 208-210 [70 Cal.Rptr. 561, 444 P.2d 353].) Thus, extrinsic evidence as to the circumstances under which a written instrument was made is admissible to interpret the instrument, although not to give it a meaning to which it is not reasonably susceptible. (*Id.* at p. 211.) On review of the trial court's interpretation of a document, the appellate court's proper function is to give effect to the intention of the maker of the document. (*Id.* at p. 213.)

"Particularly in the field of interpreting trusts and wills, each case depends upon its own peculiar facts, and ' ". . . precedents have comparatively small value . . . ." ' (*Estate of Lawrence* (1941) 17 Cal.2d 1, 6 [108 P.2d 893]; *Estate of Russell*, *supra*, 69 Cal.2d at pp. 210-211.) It is the intention of the trustor, not the trustor's lawyer, which is the focus of the court's inquiry.

(*Estate of Lindner* (1978) 85 Cal.App.3d 219, 226 [149 Cal.Rptr. 331].) . . .” (*Wells Fargo Bank* v. *Marshall, supra,* 20 Cal.App.4th at pp. 452-453.)

■ An ambiguity in a written instrument exists when, in light of the circumstances surrounding the execution of the instrument, " ‘the written language is fairly susceptible of two or more constructions.’ [Citations].” (*Estate of Russell* (1968) 69 Cal.2d 200, 211 [70 Cal.Rptr. 561, 444 P.2d 353].)

■ Where a trust instrument contains some expression of the trustor’s intention, but as a result of a drafting error that expression is made ambiguous, a trial court may admit and consider extrinsic evidence, including the drafter’s testimony, to resolve the ambiguity and give effect to the trustor’s intention as expressed in the trust instrument. (*Lissauer* v. *Union Bank & Trust Co.* (1941) 45 Cal.App.2d 468, 472-473 [114 P.2d 367] (hereafter, *Lissauer*).)

 2. *There are three patent ambiguities in the trust instruments*

■ Applying these legal principles, we conclude there are three patent ambiguities in the trust instruments at issue here. First, the Trust and the Property Agreement when taken together are facially ambiguous as to whether Jeannette and Virgil transmuted all their separate property into community property, as Mark contends, or whether their separate property retained its character as such, as Doolittle contends. As we have discussed, the Trust expressly states that all property made part of the trust estate “shall retain its separate or community character.” Specifically, section 3 (“Character of Trust Property”) of article two provided in part: “Any property conveyed or distributed to, or in any manner received by the Trust shall retain its separate or community character. . . .”

However, the same day they executed the Trust Jeannette and Virgil also executed a “Property Agreement” which appeared to indicate they had agreed to transmute all their separate property into community property. The second and third recitals set forth on page one of the Property Agreement state:

“WHEREAS, the parties own, hold and possess property which is taken or held partially in the name of VIRGIL K. IKE, partially in the name of JEANNETTE B. IKE, and partially in the names of both parties, either as joint tenants or otherwise; and

“WHEREAS, *the parties desire to come to an agreement and do hereby transfer, assign and convey all such property to themselves as community*

*property.*" (Italics added.) Other provisions in the Property Agreement, however, appeared to indicate no such transmutation into community property was intended. For example, section 3 ("Purpose of Agreement") of the Property Agreement provides in part: "The purpose of this Agreement is to clarify the status of the property held by the parties and *shall not affect a gift from either party to the other or any interest in properties held by either party. . . .*" (Italics added.) That the trustors intended no such transmutation is also indicated by the disputed provisions of sections 1 and 2 of article nine which provide for the distribution of "all" of each trustor's "separate property and . . . one-half (½) interest in the community property . . . ."

Second, the Trust is patently ambiguous as to whether the intestacy clause in section 5 of article nine of the Trust, as it was originally drafted, was revoked by the First Amendment. We note the Heirs claim that Jeannette's share of the trust estate should be distributed to them under this intestacy clause, which provides for the intestate distribution of any portion of the trust estate not disposed of under the other sections of article nine. The First Amendment expressly purported to amend article nine. The introductory paragraph of the First Amendment states: "EFFECTIVE THIS 11th day of October, 1990, *Article Nine* of the Ike Family Trust dated November 1, 1988, *shall be amended to read as follows*: . . . ." (Italics added.) However, the First Amendment made no reference to the intestacy clause, but did restate certain portions of section 1 pertaining to the distribution of Virgil's share of the estate, and altered section 2 pertaining to the distribution of Jeannette's share of the trust estate. The First Amendment contained no express language to clearly indicate whether the trustors intended to amend article nine in its entirety, thereby effectively revoking the intestacy clause in section 5 by making no reference to it, or whether the trustors intended to amend sections 1 and 2 only, thereby leaving intact the intestacy clause in section 5 as originally drafted.

Finally, because the Trust is patently ambiguous with regard to the characterization of the trustors' property and whether the trustors revoked the intestacy clause in article nine, the Trust is also patently ambiguous with respect to sections 1 and 2 of article nine which provide for the distribution of each trustor's separate property and one-half interest in community property to designated beneficiaries.

Because we independently conclude these three patent ambiguities exist in the trust instruments at issue here, we find no error in the court's finding that the Trust is "ambiguous as to distribution of the Trust after the death of the

surviving Trustor, when terms and provisions of the entire document, as well as its purpose, are considered."

 3. *Extrinsic evidence of the circumstances surrounding the execution of the Trust and Property Agreement is admissible to resolve the patent ambiguities in these instruments, and shows the instruments are reasonably susceptible of the meaning Doolittle attributes to them*

■ Because we independently conclude there are patent ambiguities in the Trust and related Property Agreement at issue in this case, we also conclude the court properly admitted and considered extrinsic evidence of the circumstances surrounding the execution of the instruments for the purpose of resolving the ambiguity it found and giving the instruments a meaning of which they are reasonably susceptible in order to give effect to the intentions of the trustors. (*Wells Fargo Bank* v. *Marshall, supra,* 20 Cal.App.4th at p. 453.)

Doolittle argues the extrinsic evidence establishes that Jeannette and Virgil intended that the cash and noncash assets they conveyed into trust retain their "separate" or "community" character. Doolittle also contends they intended that such characterization control the ultimate distribution of their respective estates such that upon the death of the survivor, Jeannette's separate property and her interest in the community property would be distributed to the beneficiaries she designated in section 2 of article nine, and Virgil's separate property and his interest in the community property would be distributed to the beneficiaries he designated in section 1 of article nine. We agree and conclude the Trust and the Property Agreement are reasonably susceptible of such meaning when taken together in light of the circumstances surrounding the execution of these instruments.

The extrinsic evidence admitted at trial resolves the ambiguity concerning the characterization of the assets Jeannette and Virgil conveyed in trust. The drafter of the trust instruments, Thomas McGrath, testified the Property Agreement contained a drafting error in that it stated contrary to Jeannette and Virgil's intent that all of their separate property was to be converted into community property. He also testified the only purpose of the Property Agreement was to assure that any property "held jointly, for example, in joint tenancy was to be treated as community property so that in the event one of them died the other one would get a full step up in tax basis."

Miles Hansen testified Virgil had stated he had no claim to Jeannette's property and they wanted to retain the separateness of their property. Doolittle testified Jeannette wanted her separate property to remain separate,

and Virgil wanted "nothing to do" with Jeannette's property. Even Mark's expert witness, Kent Hildreth, testified during cross-examination that the Property Agreement executed by Jeannette and Virgil was ambiguous and conflicted with the characterization of their property set forth in schedules A through C.

We conclude the language in the Trust and the Property Agreement is reasonably susceptible of being interpreted to mean that the assets the trustors conveyed into trust retained their character as separate or community property. As we have discussed, section 3 of article two of the Trust expressly states that all property made part of the trust estate "shall retain its separate or community character," and sections 1 and 2 of article nine contain specific references to Jeannette and Virgil's separate property and one-half share of community property. Section 3 ("Purpose of Agreement") of the Property Agreement provides in part that it "shall not affect a gift from either party to the other or any interest in properties held by either party. . . ."

The extrinsic evidence admitted at trial resolves the ambiguity concerning the intestacy clause. Doolittle's expert witness, Jack Charney, testified it was his opinion the First Amendment to the Trust eliminated the intestacy clause in section 5 of article nine. Mark's expert, Hildreth, testified the Trust was ambiguous as to whether the intestacy clause remained in the Trust following the trustors' execution of the First Amendment. Hildreth also gave testimony which inferentially indicated the trustors intended to dispose of all of their assets and avoid intestacy. When asked whether it was inconceivable that anyone would design a document that included an article nine provision that failed to take care of the assets that were to be placed in trust and disbursed out of the trust, Hildreth responded the drafter is typically hired to make a disposition of the assets.

As we have discussed, the First Amendment to the Trust is reasonably susceptible of being interpreted in this manner. The First Amendment expressly purported to amend article nine and restated sections 1 and 2, yet it made no reference to the intestacy clause previously set forth in section 5.

Finally, the extrinsic evidence resolves the ambiguity concerning sections 1 and 2 of article nine, and establishes it was the trustors' intent that upon the death of the survivor, regardless of who died first, the portion of the trust estate that had consisted of Jeannette's separate property and her share of the community property should be distributed to her named beneficiaries, and the portion of the trust estate that had been Virgil's separate property and his share of the community property should be distributed to his named beneficiaries. Thomas McGrath, the drafter of the Trust, testified that under his

custom and practice he received from Jeannette and Virgil a listing of Jeannette's separate property, Virgil's separate property, and their "joint" property, and his office used this information to prepare schedules A, B and C. He further testified Jeannette never expressed to him a desire that her assets should pass to Virgil's heirs if she predeceased him.

McGrath also testified Jeannette and Virgil told him that upon their death Jeannette wanted her assets to go to a series of relatives and charities, and Virgil wanted his share of the estate to go to his two sons. McGrath admitted that while it was his intent in drafting the Trust to accomplish what Jeannette and Virgil wanted, as a result of his drafting errors article nine did not accomplish what they wanted, and he ". . . should have just said upon the death of the survivor, whoever it . . . might be, Virgil's share goes this way [and] Jeannette's goes that way. . . ."

Jack Charney, Doolittle's expert, testified without objection it was his opinion that Jeannette and Virgil did not intend the disposition of their respective shares of the trust estate would depend on who died first, but rather they intended their respective beneficiaries to receive certain assets.

As we have discussed, even Mark's expert, Kent Hildreth, testified on cross-examination it was his opinion the drafting of article nine was poor, as shown by the following excerpts from the reporter's transcript:

"Q. Article 9 doesn't make any sense, does it, when taken in context with the whole of the document?

"A. It doesn't provide a distribution under a certain scenario.

"Q. What it does appear to do is make the timing of the death somehow important, but depending upon which condition occurs, Jeannette dies or Virgil dies, somebody's property isn't taken care of the way Article 9 is drafted?

"A. That's correct.

"Q. The drafting in this instance in your professional opinion is, again, poor?

"A. Yes.

"Q. It is a drafting error as written, is it not?

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The Witness: It is. . . .

"Q. In fact, it's inconceivable, isn't it, that anyone would design or purposely draw a document that included an Article 9 distribution provision that didn't take care of the assets that were designed to be placed in trust and disbursed out of the trust in an ultimate sense?

"A. That is typically what we're hired for; is to, in fact, make a disposition of the assets."

Sections 1 and 2 of article nine are reasonably susceptible of the meaning Doolittle attributes to them. The title of article nine—"Distribution Upon the Death of Surviving Trustor"—is consistent with an intent that Jeannette and Virgil's shares of the trust estate be distributed separately to their respective designated beneficiaries "upon the death of the surviving trustor" regardless of who died first. Sections 1 and 2 of article nine each contain an expression that upon the death of the trustor, all of his or her separate property and one-half share of the community property is to be distributed to the designated beneficiaries.

As we have discussed, where a trust instrument contains some expression of the trustor's intention, but as a result of a drafting error that expression is made ambiguous, a trial court may admit and consider extrinsic evidence, including the drafter's testimony, to resolve the ambiguity and give effect to the trustor's intention as expressed in the trust instrument. (*Lissauer, supra*, 45 Cal.App.2d at pp. 472-473.) Here, the expression of the trustors' intent in sections 1 and 2 of article nine was rendered ambiguous by McGrath's admitted multiple drafting errors. However, the extrinsic evidence, including McGrath's testimony, resolves the ambiguity and establishes there is no merit to Mark's contentions that Jeannette and Virgil intended to distribute the entire trust estate to him and his brother in the event (as actually occurred) Jeannette predeceased Virgil.

B. *The Court Had Ample Authority in Equity, Founded in Common Law, and Under Statutory Law to Modify or Reform the Trust to Accomplish the Purposes of the Trustors as Expressed in the Trust*

Mark's principal contention is that the court improperly rewrote the provisions set forth in the Trust in article four, section 1, paragraph (d) (governing the power of the trustee to amend or revoke the Trust) and in sections 1 and 2 of article nine (governing distribution of the trust property upon the death of the surviving trustor) in a manner that permits distribution of Jeannette and Virgil's respective shares of the trust estate to the beneficiaries they separately named in article nine. Mark's contention, which we

reject for reasons we discuss below, raises an issue as to the scope of the court's power to modify or revoke the Trust.

1. ■ *Trial courts have equitable power, founded in common law, to modify a trust under "peculiar" or "exceptional" circumstances where necessary to accomplish the purpose of the trustor(s) as expressed in the trust instrument*

Citing *Adams* v. *Cook* (1940) 15 Cal.2d 352 [101 P.2d 484], and section 167, subdivision (1), of the Restatement Second of Trusts,[10] the Court of Appeal in *Stewart* v. *Towse* (1988) 203 Cal.App.3d 425, 428 [249 Cal.Rptr. 622], recognized that "California courts have long had the equity power to modify the terms of a trust where such modification is necessary to preserve the trust or *serve the original intentions of the trustor*. . . ." (Italics added.) The *Adams* and *Stewart* cases are instructive of how broad is the common law power of a trial court in equity to modify a trust.

In *Adams* v. *Cook, supra,* 15 Cal.2d 352, certain real property was conveyed in trust to be sold within a certain period of time at a price fixed in the trust instrument, which also authorized the trustee to lease the property " 'subject to the sale of said property under the conditions of this trust.' " (*Id.* at p. 354, italics omitted.) The beneficiaries applied for equitable relief in the administration of the trust after oil was discovered on the property and the trustee refused to lease the property to oil companies who desired an oil lease free of the restrictions as to sale contained in the trust instrument. (*Id.* at p. 355.) The beneficiaries alleged the oil was being drained by numerous wells drilled on adjacent properties, and unless the trustee was permitted to execute an oil lease free of the restrictions as to sale, the trust would greatly depreciate in value. (*Ibid.*) The trial court entered a judgment modifying the powers of the corporate trustee to permit it to enter into an oil lease free of the restrictions as to sale as a matter of necessity for the preservation of the corpus of the trust. (*Id.* at p. 356.)

In affirming the judgment, our Supreme Court in *Adams* v. *Cook* held that trial courts have equitable power to modify a trust where the primary purpose of the trust would be defeated by "slavish adherence" to its terms, stating: ". . . [T]he rule against courts modifying the terms of a contract

---

[10]Subdivision (1) of section 167 ("Change of Circumstances") of the Restatement Second of Trusts provides: "(1) The court will direct or permit the trustee to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust."

. . . does not apply to declarations of trust, where the primary purpose of the trust would not be accomplished by a strict adherence to the terms of the declaration of trust and . . . *when it is made to appear in a court of equity . . . that the benefits and advantages which the trustors desired to confer upon the beneficiaries would not accrue to them by 'a slavish adherence to the terms of the trust', the court may modify the terms of the trust to accomplish the real intent and purpose of the trustors. . . .*" (*Adams* v. *Cook, supra,* 15 Cal.2d at p. 361, italics added.)

Six years later, our Supreme Court in *Moxley* v. *Title Ins. & Trust Co.* (1946) 27 Cal.2d 457, 468 [165 P.2d 15, 163 A.L.R. 838] clarified in dictum its decision in *Adams* v. *Cook* by stating "[i]t is only under *peculiar circumstances* such as those exemplified in *Adams* v. *Cook* [citation] that a court has the power to modify an active trust." (Italics added.) The *Moxley* court also stated that in previous cases permitting modification of a trust, "the courts were dealing with *exceptional situations* in which modification was decreed in order to carry out, rather than to defeat, the primary purpose of the trustor *as expressed in the trust instrument. . . .*" (*Ibid.,* italics added.)

In *Stewart* v. *Towse, supra,* 203 Cal.App.3d 425, the Court of Appeal reversed a judgment denying for lack of jurisdiction a petition by the trustee of three inter vivos trusts (one revocable and two irrevocable) who was seeking authorization to modify certain terms of the two irrevocable trusts and change the designated successor trustee (Towse). In *Stewart,* as here, the trustee and his wife in their capacities as cotrustors had created an inter vivos trust which split into subtrusts (one revocable trust (Trust A) and two irrevocable trusts (Trusts B and C)) upon the death of the wife. (*Id.* at p. 427.) The husband as the surviving trustor, beneficiary and trustee became temporarily incapacitated, and Towse as the designated successor trustee acted as "quasi successor" trustee. Upon his recovery, the husband lost confidence in Towse, amended Trust A to designate a new successor trustee, and petitioned the trial court for authority to modify Trusts B and C to replace Towse, who refused to resign as successor trustee. (*Id.* at pp. 427-428.)

The Court of Appeal in *Stewart* held the trial court had jurisdiction to grant the petition and authorize the requested modification of the irrevocable trusts. (*Stewart* v. *Towse, supra,* 203 Cal.App.3d at p. 431.) In so holding, the Court of Appeal stated that such jurisdiction was based on the 1986 revisions to the Probate Code (including §§ 15409, subd. (a), and 17200, subd. (b)(13), discussed *post*) which codified the common law equitable power of trial courts to modify the terms of a trust where such modification is necessary to serve the original intentions of the trustors. (203 Cal.App.3d at pp. 428-429.)

We reject Mark's assertion that a trial court cannot modify a trust to remedy a drafting error. In California, the common law equitable power of a trial court to modify or reform a trust extends to situations where, as here, the trust instrument contains some expression of the trustor's intention, but a drafting error renders that expression ambiguous. In *Lissauer, supra,* 45 Cal.App.2d 468, the trustor (Dora Horn) created an inter vivos trust for the purpose of providing her a modest income during her lifetime. (*Id.* at p. 469.) As a result of a drafting mistake, the trust agreement contained two conflicting provisions relating to the distribution of the principal and undistributed income of the trust upon Dora's death. Under the first provision, each of Dora's two children would receive upon Dora's death only a one-half interest in the trust income during his or her lifetime, and they would have no interest in the principal. Under the second provision, however, the children were given the principal, with their interests being "contingent merely as to the time of enjoyment." (*Id.* at p. 470.)

Following Dora's death, one of her children (Lottie) brought an action to reform the trust. Lottie argued the trust was ambiguous in light of the two conflicting provisions for distribution of the trust estate upon Dora's death. (*Lissauer, supra,* 45 Cal.App.2d at p. 471.) Lottie alleged it was Dora's intention that the trust principal and remaining income be distributed to Dora's children immediately upon Dora's death, and that Dora executed the trust agreement mistakenly believing it so provided. She further alleged the provision limiting the interests of the children to income only was inserted in the trust document by mistake. (*Ibid.*)

The trial court in *Lissauer* refused to reform the trust, and entered judgment against Lottie. On appeal the Court of Appeal reversed the judgment. (*Lissauer, supra,* 45 Cal.App.2d at p. 473.) After reviewing the extrinsic evidence relating to the circumstances surrounding the execution of the trust agreement, including the trial testimony of the drafter of the trust agreement (Mr. Cameron) and of a confidant of Dora's (Mr. Koolish) who had assisted her in procuring and preparing the trust agreement, the Court of Appeal in *Lissauer* agreed with Lottie that the agreement was ambiguous and concluded the trial court erred in finding there was no mistake in the drafting of the agreement. (*Ibid.*) In reversing the judgment, the Court of Appeal instructed the trial court to grant the relief requested in Lottie's action for reformation of the trust instrument. (*Ibid.*)

*Lissauer, supra,* 45 Cal.App.2d 468, thus demonstrates that the common law equitable power of a trial court to modify or reform a trust extends to

situations where the trust instrument contains some expression of the trustor's intention, but a drafting error renders that expression ambiguous.

We thus conclude the court below had equitable power, founded in common law as discussed above, to modify the Trust provided (1) a "peculiar" or "exceptional" circumstance made modification necessary to accomplish the purpose of the trustors, and (2) there was some expression in the trust instrument of the purpose of the trustors. We conclude that under the decision in *Lissauer*, a drafting error in a trust instrument which renders ambiguous an expression contained therein regarding the administrative or distributive intentions of the trustor(s) constitutes a "peculiar" or "exceptional" circumstance within the meaning of *Moxley* v. *Title Ins. & Trust Co.*, *supra*, 27 Cal.2d 457, which may justify an equitable modification of a trust instrument to accomplish the purpose of the trustor(s).

> 2. *The 1986 revisions to the Probate Code gave to trial courts statutory authority to alter the administrative or distributive provisions of a trust where necessary to accomplish the purpose of the trust*

As we have discussed, in 1986 the Legislature revised the Probate Code and codified the common law equitable power of trial courts to modify the terms of a trust instrument where such modification is necessary to serve the original intentions of the trustors. (*Stewart* v. *Towse*, *supra*, 203 Cal.App.3d 425, 428.) The 1986 revisions were based on Assembly Bill No. 2652 as amended, which was introduced to effectuate the California Law Revision Commission's Recommendation Proposing the Trust Law (Dec. 1985) (Recommendation). (See 18 Cal. Law Revision Com. Rep. (1986) p. 501; Cal. Law Revision Com. com. (1990 enactment), 54 West's Ann. Prob. Code (1991 ed.) § 15000 et seq., p. 481.) The proposed trust law reorganized existing law and consolidated it in the Probate Code. (*Id.* at p. 507.) The legislation retained much of the substance of existing law, while eliminating distinctions between living trusts and testamentary trusts to the extent practicable. (*Ibid.*)

In its Recommendation, the California Law Revision Commission stated in part that "[t]he proposed law contains comprehensive rules on modification . . . of trusts in place of the scattered and incomplete references in existing statutes . . . *The proposed law gives the court authority to alter the administrative or distributive provisions of a trust where necessary to accomplish the purpose of the trust.* . . ." (Recommendation, 18 Cal. Law Revision Com. Rep., *supra*, at pp. 511, 573.)

Mark contends a trial court's statutory power to modify a trust is strictly limited by the provisions of section 15400 et seq. ("Modification and Termination of Trusts"), and the only provision which gives the court the power to modify the terms of a trust without the consent of all the beneficiaries is section 15409,[11] which he asserts does not apply here. We reject these contentions.

Section 17200,[12] subdivision (a), allows a trustee or beneficiary to "petition the court . . . concerning the internal affairs of the trust . . . ." Subdivision (b) sets forth a nonexclusive list of examples of proceedings which "concern[] the internal affairs of the trust" within the meaning of section 17200, subdivision (a). Among the examples relevant herein are (1) "[a]scertaining beneficiaries and determining to whom the property shall pass or be delivered upon final . . . termination of the trust, to the extent the determination is not made by the trust instrument" (§ 17200, subd. (b)(4)); and (2) "[a]pproving or directing the modification . . . of the trust" (id., subd. (b)(13)). We note these statutory provisions are broadly worded.

It is true the 1990 Law Revision Commission comment to section 17200 states in part that "[a]s to modification . . . of trusts under paragraph (13), see Sections 15400-15410. . . ." (Cal. Law Revision Com. com., 54A West's Ann. Prob. Code (1991 ed.) § 17200, p. 194.) However, none of the provisions in these sections (§§ 15400-15410) state that these various provisions set forth the exclusive grounds for modification of a trust.

Absent such an express statutory provision limiting the grounds for modification of a trust to those set forth in section 15400 et seq., we conclude the broader equitable power of trial courts to modify or reform a trust is preserved by operation of section 15002, which expressly provides: "Except to the extent that the common law rules governing trusts are modified by statute, the common law as to trusts is the law of this state."

---

[11]Section 15409 provides:

"(a) On petition by a trustee or beneficiary, the court may modify the administrative or dispositive provisions of the trust or terminate the trust if, owing to circumstances not known to the settlor and not anticipated by the settlor, the continuation of the trust under its terms would defeat or substantially impair the accomplishment of the purposes of the trust. In this case, if necessary to carry out the purposes of the trust, the court may order the trustee to do acts that are not authorized or are forbidden by the trust instrument.

"(b) The court shall consider a trust provision restraining transfer of the beneficiary's interest as a factor in making its decision whether to modify or terminate the trust, but the court is not precluded from exercising its discretion to modify or terminate the trust solely because of a restraint on transfer."

[12]Section 17200 was added by Statutes 1986, chapter 820, section 40, pages 2787-2788.

### 3. *Civil Code section 3399 codifies the equitable action for reformation and permits a court in equity to reform a trust based on mistake*

As we have discussed, the court reformed sections 1 and 2 of article nine of the Trust under the authority of Civil Code section 3399 to correct the "serious drafting errors" in article nine, which the court found "[did] not truly express the actual intent of Trustors." In its statement of decision, the court reasoned that "[a] Declaration of Trust, like any other contract, may be reformed and revised under California Civil Code [section] 3399 to correct a drafting error which, if left intact, would conflict [with] the actual expressed intent of the contracting parties."

Doolittle asserts he had standing as a beneficiary named in section 2 of article nine of the Trust to seek reformation of article nine. We agree.

Civil Code section 3399 provides: "*When contract may be revised.* When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value."

In *Getty* v. *Getty* (1986) 187 Cal.App.3d 1159, 1180 [232 Cal.Rptr. 603], the Court of Appeal for the Second District, Division Seven, held that an intended trust beneficiary had standing to seek reformation of a trust agreement under Civil Code section 3399. In so holding, the *Getty* court noted that Civil Code section 3399 is a codification of the equitable action for reformation of a written instrument, and the sole purpose of the reformation doctrine is to correct a written instrument in order to effectuate a common intention of the parties which was incorrectly reduced to writing. (*Getty* v. *Getty*, *supra*, 187 Cal.App.3d at pp. 1178, 1180.) However, the *Getty* court also noted that a court cannot create a new agreement for the parties under a theory of reformation. (*Id.* at p. 1178.)

We thus conclude that Civil Code section 3399 recognizes the equitable common law power of a trial court to reform a trust agreement based on mistake, but not to create a new trust agreement under the theory of reformation. (*Getty* v. *Getty*, *supra*, 187 Cal.App.3d at p. 1178.)

C. *The Court Properly Reformed or Modified Articles Four and Nine of the Trust to Accomplish the Purpose of the Trustors as Expressed in Article Nine of the Trust to Distribute Their Respective Shares of the Trust Estate to Their Designated Beneficiaries Upon the Death of the Surviving Trustor*

The court reformed both article four and article nine of the Trust. We first address the court's reformation of article nine.

1. *The court properly reformed or modified article nine of the Trust*

The court found that "[a]s a separate and independent basis for adjudication of distribution issues, numerous drafting errors exist requiring reformation of Article Nine." The court also found that clear and convincing evidence established that "Article Nine contains serious drafting errors which do not truly express the actual intent of Trustors."

In the interest of convenience, we again set forth both the reformed text and the original text of sections 1 and 2 of article nine. The court revised section 1 of article nine to provide in part as follows:

*Reformed Text*

"ARTICLE NINE

"DISTRIBUTION UPON THE DEATH OF SURVIVING TRUSTOR

"SECTION 1. *DISTRIBUTION OF VIRGIL W. IKE'S SEPARATE PROPERTY AND ONE-HALF (½) INTEREST IN COMMUNITY PROPERTY*[13]

"Upon the death of *the Surviving Trustor,* ***[14] Trustee(s) shall distribute all of *** *VIRGIL W. IKE'S* separate property and his one-half (½) interest in the community property as follows: . . . ."

(Remaining text is unchanged.)

*Original Text*

"ARTICLE NINE

"DISTRIBUTION UPON THE DEATH OF SURVIVING TRUSTOR

"SECTION 1. IF VIRGIL W. IKE IS THE SURVIVING TRUSTOR

"Upon the death of VIRGIL W. IKE, if he is the Surviving Trustor, Trustee(s) shall distribute all of his separate property and his one-half (½) interest in the community property as follows: . . . ."

(As in the original text.)

The court revised section 2 of article nine to provide in part as follows:

---

[13]Additions or changes are indicated by bolding italics.
[14]Deletions are indicated by bolded asterisks.

| Reformed Text | Original Text |
|---|---|
| "**Section 2. *Distribution of Jeannette B. Ike's Separate Property and One-Half (½) Interest in Community Property***<br><br>"Upon the death of *the Surviving Trustor,* *** Trustee(s) shall distribute all of *** *Jeannette B. Ike's* separate property and her one-half (½) interest in the community property as follows: . . . ." | "**Section 2. If Jeannette B. Ike Is the Surviving Trustor**<br><br>"Upon the death of JEANNETTE B. IKE, if she is the Surviving Trustor, Trustee(s) shall distribute all of her separate property and her one-half (½) interest in the community property as follows: . . . ."<br><br>(As in the original text.) |

We again note the title of article nine—"Distribution Upon the Death of Surviving Trustor"—remained unchanged.

 Under the authorities discussed above, we conclude the court had ample equitable and statutory power to modify or reform sections 1 and 2 of article nine of the Trust to accomplish the distributive purposes of the trustors as expressed in the Trust. We further conclude the court properly exercised that power to reform sections 1 and 2 of article nine.

As we discussed above in part A, substantial extrinsic evidence, including the drafter's testimony, established that Jeannette and Virgil intended that upon the death of the survivor Jeannette's separate property and her interest in the community property would be distributed to the beneficiaries she designated in section 2 of article nine, and Virgil's separate property and his interest in the community property would be distributed to the beneficiaries he designated in section 1 of article nine. Substantial extrinsic evidence also established that the expression of the trustors' distributive intent set forth in the original versions of sections 1 and 2 of article nine, which was reasonably susceptible of the interpretation advanced by Doolittle, was rendered ambiguous by the drafting attorney's admitted multiple drafting errors.

2. *The court properly reformed or modified article four of the Trust*

The court found that clear and convincing evidence established that the provisions in article four making the Trust revocable were the result of another drafting error, and that many of the provisions of the Trust made

sense only if Trust B (the Decedent's Trust) was irrevocable. Finding that Jeannette and Virgil created the Trust to avoid probate, minimize estate taxes and take full advantage of the estate tax marital deduction, the court also found the extrinsic evidence established that Jeannette and Virgil intended Trust B to be irrevocable to accomplish their estate planning goals.

To give effect to the trustors' intentions the court exercised its equitable powers and reformed section 1, paragraph (d) of article four ("Administration of the Trust While Both Trustors Are Alive") of the Trust as follows:

*Reformed Text* | *Original Text*

"d. Amend and Revoke the Trust.

"The Trustors, during their joint lifetimes, shall have the absolute right to revoke or amend this Trust, in whole or in part, at any time. Any amendment or revocation must be in writing and delivered to the Trustee(s). After the death of the first Trustor, at any time or times, so long as the Surviving Trustor is competent, he or she shall have the power to revoke or amend *** *Trust 'A' only. After the death of the first Trustor, Trust 'B' is irrevocable.*"

"d. Amend and Revoke the Trust.

"The Trustors, during their joint lifetimes, shall have the absolute right to revoke or amend this Trust, in whole or in part, at any time. Any amendment or revocation must be in writing and delivered to the Trustee(s). After the death of the first Trustor, at any time or times, so long as the Surviving Trustor is competent, he or she shall have the power to revoke or amend the Trust."

We conclude that the court's findings are supported by substantial evidence, and that the court properly reformed or modified article four of the Trust. The attorney who drafted the trust, McGrath, testified the trust should have provided that Trust B (the Decedent's Trust) was irrevocable. Doolittle's expert witness, Charney, testified it made no sense from a tax planning or tax saving standpoint to include a provision for Trust "B" to be revocable, and further testified it was a "fundamental mistake" to include such a provision in the Trust. When asked what would need to be done to reform the Trust to be consistent with the intent of the trustors to avoid taxes, Charney testified (among other things) the provision allowing the surviving trustor to amend or revoke Trust B would have to be deleted.

D. *Substantial Evidence Supports the Court's Findings on Tracing and Apportionment of Assets*

The court correctly recognized that distribution of the trust assets under article nine was dependent upon a characterization of trust assets as either separate or community property, and it is the character of trust property at the time of Jeannette's death on December 15, 1990, which controls the ultimate disposition of the trust corpus to the designated beneficiaries of Jeannette and Virgil.

Mark contends the court erred not only in its tracing of cash and stock assets, which Mark asserts should be viewed as community property, but also in apportioning the cash assets by utilizing percentages of cash assets existing on the date of Jeannette's death (discussed *post*) to determine the amount of cash assets to be distributed as community property, separate property of Jeannette, and separate property of Virgil. We reject these contentions.

In its statement of decision, the court set forth in detail the assets which were community property, Jeannette's separate property, and Virgil's separate property at the time the Trust was created on November 1, 1988. The court also set forth in detail the assets which at the time of Jeannette's death on December 15, 1990, were community property, Jeannette's separate property, and Virgil's separate property.

The court further found that certain separate property funds belonging to Jeannette were commingled with community property funds after the Trust was created and before Jeannette's death. In tracing the source of funds in the commingled accounts, the court considered not only Doolittle's testimony regarding his efforts in tracing Jeannette's separate property accounts, the "Tracing of Cash Assets in Accounts" chart marked as trial exhibit 154, the original passbooks for each of the accounts, and documentary data detailing relevant deposits and withdrawals from the accounts. The court found that on the date of Jeannette's death (1) Pacific savings account No. 54-749403, a commingled account, contained $125,762.06, of which amount $93,690.46 could be directly traced to Jeannette's separate property, and $32,071.60 could be traced directly to community property; and (2) Pacific savings account No. 54-741988, a commingled account, contained $38,540.33, of which amount $25,059.92 could be directly traced to Jeannette's separate property, and $13,480.41 could be traced directly to community property.

The court also found that of the trust cash assets on the date of Jeannette's death ($698,668.42), 41.86 percent ($292,465.89) was community property,

53.35 percent ($372,746.55) was Jeannette's separate property, and 4.79 percent ($33,455.98) was Virgil's separate property.

The court then found it was proper for the successor trustee (Doolittle), under the powers conferred by article eleven, section 3, subparagraph d of the Trust,[15] to utilize these cash assets percentages as they existed on December 15, 1990, to determine the amount of community property, separate property of Jeannette, and separate property of Virgil to be distributed under article nine to the beneficiaries designated by Jeannette and Virgil.

We find no error in the court's use of the cash assets percentages as of the date of Jeannette's death for the purpose of distributing the trust estate under article nine upon the termination of the Trust following Virgil's death. We believe the apportionment is reasonably consistent with the distribution powers conferred by article eleven, section 3, subparagraph d of the Trust.

We also conclude substantial evidence supports the court's findings on the tracing of Jeannette's separate property. As we discussed above, in tracing the source of funds in the commingled accounts the court considered not only Doolittle's testimony regarding his efforts in tracing Jeannette's separate property accounts, but also the "Tracing of Cash Assets in Accounts" chart marked as trial exhibit 154 and the original passbooks for each of the accounts, along with documentary data detailing relevant deposits and withdrawals from the accounts.

Finally, we find no error in the court's finding that Doolittle met his burden of rebutting the presumption that the commingled assets were community property.

E. *The Court Properly Instructed the Successor Trustee to Distribute Virgil's Share of the Trust Estate to His Designated Beneficiaries, Mark and Robert*

We conclude the court properly considered extrinsic evidence of the circumstances surrounding the execution of the Trust and the Property

---

[15] Article eleven, section 3, subparagraph d ("Distribution Powers") of the Trust provides:
"Trustee(s) are specifically authorized to make divisions and distributions of the Trust property either in cash or in kind, or partly in cash and partly in kind, or in any proportion they deem advisable. [¶] They shall be under no obligation or responsibility to make pro rata divisions and distributions in kind. [¶] Trustee(s) may allocate specific assets as to any beneficiary or share although such assets may differ in kind from the assets allocated to any other beneficiary or share. [¶] The foregoing powers shall be exercised regardless of the income tax basis of any of such assets."

Agreement to both resolve the patent ambiguities evident in those instruments, and to reform articles four and nine of the Trust to give effect to the intentions of the trustors as expressed in the Trust.

We further conclude the court properly found that "[r]eformation of article four, Section 1, subparagraph (d) eliminates the need to address [Mark's] argument that assets in TRUST 'B' became VIRGIL's separate property by virtue of his power to revoke TRUST 'B'. . . ." The court also properly found that under the Trust as reformed, Virgil as the surviving trustor did not possess the power to revoke or amend Trust B, the property in Trust B never became Virgil's separate property, Virgil never had power to appoint the disposition of the assets in Trust B, and Virgil's general power of appointment over the assets in Trust A (the Survivor's Trust) did not result in Jeannette's separate property and her interest in the community property in Trust A becoming Virgil's separate property.

Accordingly, we conclude the court properly instructed Doolittle as the successor trustee to distribute Virgil's share of the trust estate to his designated beneficiaries, Mark and Robert, and we affirm the judgment as to the petition brought by Mark.

## II. *The Heirs' Appeal*

*A. The Court Properly Instructed the Successor Trustee to Distribute Jeannette's Share of the Trust Estate to Her Designated Beneficiaries Under the Trust, Rather Than to Her Heirs Under the Laws of Intestate Succession*

The Heirs agree with Mark's contentions that the Trust is unambiguous and the court improperly reformed the Trust after erroneously admitting extrinsic evidence. The Heirs also contend, however, that Jeannette's share of the trust estate should pass to them under the intestacy clause in section 5 of article nine of the Trust and under the laws of intestate succession, because the provisions of the Trust governing distribution of Jeannette's share of the estate to her named beneficiaries (§ 2 of art. nine) contained an express condition of survivorship which failed when Jeannette predeceased Virgil. We disagree with these contentions.

For reasons we have already fully discussed, we conclude the court properly considered extrinsic evidence of the circumstances surrounding the execution of the Trust and the Property Agreement to both resolve the three patent ambiguities evident in those instruments, and to reform articles four and nine of the Trust to give effect to the intentions of the trustors as

expressed in the Trust. Even if the intestacy clause survived the First Amendment to the Trust, the entire trust estate is to be distributed under article nine as reformed by the court to the beneficiaries designated by Jeannette and Virgil.

## DISPOSITION

The judgment is affirmed. Doolittle shall recover his costs on appeal from Mark and the Heirs.

Huffman, Acting P. J., and Haller, J., concurred.

A petition for a rehearing was denied February 19, 1998, and the petition of all appellants for review by the Supreme Court was denied April 15, 1998.