Filed 9/30/13  Bellezzo v. Bellezzo CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

| California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115. |
| --- |

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
| --- | --- |
| EDWARD BELLEZZO, | B238159 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. PS006130) |
| DONALD BELLEZZO, as Trustee, etc., | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County. James A. Steele, Judge.  Affirmed.


Stephen R. McLeod for Defendant and Appellant.


Law Offices of John R. Walton, John R. Walton and Walter M. Moore for Plaintiff and Respondent.


_____

We affirm a probate court judgment enforcing a trust's no contest clause.

## FACTS

### Background

In April 1995, Edward Bellezzo (Father) and Nancy Bellezzo (Mother) executed an amended and restated declaration of trust (Trust). The Trust provided that upon the death of one spouse, the original trust's assets were to be allocated into two trusts: an irrevocable exemption trust for federal income tax purposes and a survivor's trust.[1] (Articles Sixth, Seventh, and Eighth.) The Trust provided that the surviving spouse reserved the "absolute power" to amend, revoke or terminate the survivor's trust. (Article Third.) The Trust provided that, following the surviving spouse's death, the balance of the exemption trust and the survivor's trust was to be distributed equally to Father and Mother's sons, Edward Bellezzo and Donald Bellezzo. (Article Ninth.) The Trust included a "no contest" clause (Article Eighteenth) which reads as follows:

> "In the event any beneficiary under *this trust* shall singly or in conjunction with any other person contest in any court the validity of *this trust* or the provisions of any deceased Settlor's last will (whether or not pertaining to *this trust*) or shall seek to obtain an adjudication in any proceeding in any court that *this trust*, *or any its provisions*, or that such will, or any of its provisions, is void or shall seek otherwise to void, nullify or set aside *this trust*, *or any of its provisions*, or such will, or any of its provisions, then the

---

[1] We understand an irrevocable exemption trust to be an estate planning tool for married persons who have a level of assets such that a taxable event might arise upon the death of one spouse. When married persons foresee that a transfer of assets upon the death of a spouse could potentially result in a taxable event as to the surviving spouse, they may arrange for assets to be placed into and held by an irrevocable exemption trust upon the death of a spouse. In the eyes of the IRS, the assets placed in the irrevocable exemption trust have not been transferred to the surviving spouse, and the transfer of remaining assets to the surviving spouse is viewed as being below the taxable threshold. The irrevocable exemption trust exists as a separately taxed entity until it is closed. Accordingly, income from the assets in the trust, if any, is subject to applicable taxes, payable by the trust. Apart from this mini-primer to help explain the setting of this case, this case does not implicate issues concerning taxes or irrevocable exemption trusts.

right of that person to take any interest given to him by *this trust* shall cease and the disposition of *the trust* shall be determined as though such person and all his issue had predeceased such Settlor. . . . ." (Italics added.)

Father died in November 1996. Mother died in February 2007.

***The Proceedings as to the Distribution of Assets Pursuant to the Trust***

After Mother died, Donald filed a "safe harbor" petition (see former Prob. Code, § 21320, repealed by Stats. 2008, ch. 174, § 1, operative Jan. 1, 2010; and see Prob. Code, §§ 21310-21315) for a determination that *filing* a petition to validate an offered amendment to the Trust — purportedly signed by Mother in January 2000 — would not constitute a "contest" of the Trust within the meaning of its no contest clause. In September 2008, the probate court entered an order that Donald's *filing* of his petition to validate the offered amendment to the Trust "would not constitute a contest" of the Trust. The court's order further provided: "*All issues remain subject to court review after any determination of the validity of the amendment*. These include but are not limited to any issues as to [Donald]'s *conduct*, [Edward]'s *conduct*, whether that conduct violates or does not violate the no contest clause or . . . the Probate Code [and] *the validity of the no contest clause . . . .*" (Italics added.)

In November 2008, Donald filed his petition to validate the offered amendment to the Trust purportedly signed by Mother. The offered amendment provided that $100,000 of the Trust's assets were first to be distributed to Donald, and the remaining assets then distributed equally. In short, the offered amendment changed the original, straight 50-50 distribution of assets to Donald and Edward as specified in the Trust, to the $100,000 first to Donald distribution scheme.[2]

---

[2]    The offered amendment to the Trust purportedly signed by Mother is not in the form of a formal trust amendment akin to what we have seen in other cases; it is in the form of a typed document entitled "DECLARATION." It is not notarized. The offered amendment modified the 50-50 distribution of assets to Donald and Edward prescribed in the Trust as follows: "I WANT THE FIRST . . . {$100,000} TO BE TAKEN OUT OF THE AMERICAN FUNDS INVESTMENT AND GIVEN TO . . . DONALD

3

At a series of hearings, the parties tried the validity of the offered amendment to the Trust to the probate court. Thereafter, the probate court signed and entered a statement of decision denying Donald's petition to validate the amendment to the Trust.

The probate court's statement of decision shows that Donald testified he had "authored" the amendment for Mother's signature, then drove Mother to visit Bonnie Wusz & Associates (BWA) in Orange County ("120 miles or so round trip") for Mother to sign the document and to have Laurel Hackett, a BWA employee, affix a "Medallion Signature Guaranty" stamp on the document. Bonnie Wusz and Laurel Hackett testified they never met Mother in person. Other testimony showed that a "Medallion Signature Guaranty" stamp is typically used to keep a record of incoming documents in the investment industry, and that it is not and was never intended to be the equivalent to a notary acknowledgment. Hackett was and is not a notary public. The court found it "curious" that Donald had employed the "Medallion Signature Guaranty" stamp process rather than a notary public. The court found "very troubling" other evidence showing that Donald had filed a petition in 2003 to remove Mother as trustee, and that in his earlier pleading, Donald had alleged Mother "was . . . incompetent since 1996" (i.e., three or four years before she purportedly signed the offered amendment to the Trust). The court "did not find the least credible" testimony from Donald that his attorney for the earlier petition had "made up" facts without any input from Donald. The court found the testimony of Mother's caregiver to be "impeccably credible." The caregiver's testimony showed that Mother could not have physically tolerated the amendment-signing activities ascribed to Mother by Donald (i.e., the 120 mile round trip drive to Orange County). The court's statement of decision also refers to evidence showing Donald's "penchant for signing the names of others." There is more, but we have not included all of it as we believe we have made our point.

---

BELLEZZO. THIS IS TO BE DONE BEFORE ANY OF THE REMAINDER IS DIVIDED EQUALLY . . . ."

4

This is the probate court's final conclusion:  "The court . . . finds [Donald] has failed to meet his burden to establish the authenticity and genuineness of the [offered amendment to the Trust].  The petition of Donald . . . is denied."

*The No Contest Proceedings*

After the ruling on the offered amendment to the Trust, Edward filed a petition for an order enforcing the Trust's no contest clause as to Donald.  At a hearing, the parties argued Edward's petition to the probate court, and the court took the matter under submission.  Thereafter, the court issued an order granting Edward's petition.  In granting the petition, the court ruled as legal matter that an amendment to a trust that would change a material term of the trust could be deemed an attempt to "void, nullify or set aside" the affected trust term within the meaning of the Trust's no contest clause.  Thus, it could constitute a contest under the no contest clause.  Next, the court noted that, under the Probate Code, a no contest clause will not be enforced unless the contest is brought without probable cause.  The court restated its prior finding that Mother "never signed" the amendment offered by Donald, and added this further finding:  "there is no reason to believe [that Donald] would not have known the document had not been signed by his mother."  In other words, the court found that Donald did not have probable cause to believe the offered amendment was authentic.  The court signed and entered judgment granting Edward's petition to enforce the Trust's no contest clause.

Donald filed a timely notice of appeal.

## DISCUSSION

Donald does not challenge the probate court's underlying decision that he did not meet his burden to prove Mother had signed the amendment to the Trust that he offered.  Donald contends the court erred when it subsequently ruled that he violated the Trust's no contest clause by litigating the validity of the offered amendment.  We disagree.

## I.    A "No Contest" Clause Was Intended

Donald contends there is no evidence that his parents intended to include a no contest clause in the Trust, and thus it should be disregarded.  He is mistaken.

5

We agree with Donald that a no contest clause must be "strictly construed" to avoid a forfeiture that the testator did not intend. (Prob. Code, § 21312; and see former Prob. Code, § 21304; and see also *Burch v. George* (1994) 7 Cal.4th 246, 254.) We also agree with him that no evidence was presented outside of the Trust itself showing Father and Mother's intentions concerning the no contest clause. However, we disagree with Donald's claim that his parents had no idea the no contest clause was in the testamentary document or that they would not have sanctioned its broad application. The evidence showing that Father and Mother intended the no contest clause to be included in the Trust is established by its undisputed existence in the Trust, their undisputed signatures on the Trust, and by the absence of evidence, or even a colorable claim, that the no contest clause was somehow put in the Trust, without their knowledge, after the fact.

Donald filed a "safe harbor" petition for a determination whether a petition to validate the offered amendment to the Trust would violate the no contest clause in the Trust; his petition did not challenge the no contest clause as a sham. Donald's petition by its very nature explicitly acknowledged that the no contest clause existed and was potentially implicated. Donald cites no legal authority in support of his proposition that language in a written instrument must be deemed out in the first instance, and deemed in only after there is evidence showing it was intended to be in. Here, where there is absolutely no dispute concerning the existence of a written instrument or the presence of a term in the writing, even a rule requiring "strict construction" does not mean a court may simply excise language from the writing.

## II. There Was a "Contest"

Donald next argues that when a testator makes an amendment to a testamentary instrument it is not a "contest," and, thus, the amendment "could not be a contest as to the beneficiary who brings it forward." Donald cites and discusses *Poag v. Winston* (1987) 195 Cal.App.3d 1161 (*Poag*), *Estate of Lewy* (1974) 39 Cal.App.3d 729, and *Estate of Watson* (1986) 177 Cal.App.3d 569 (*Watson*) in support of his argument. We are not persuaded.

6

Before discussing the cases cited by Donald, we must note an initial misconception in his argument. Donald did not merely bring forward an amendment to the Trust. The probate court in the underlying proceeding found that Donald *did not prove that Mother signed the offered amendment to the Trust*. In the no contest proceeding, the court found that Donald had "no reason to believe" that Mother signed the amendment. In the current appeal, Donald does not challenge these factual findings. As a result, we remain mindful of the following factual context in evaluating Donald's legal arguments: Donald did not bring forward an amendment to the Trust; he brought forward a document never signed by Mother, with no reason to believe it was signed by Mother, and offered it as an amendment to the Trust. With this framework in place, we turn to the cases.

In *Poag, supra,* 195 Cal.App.3d 1161, Weingart established a trust with approximately 29 beneficiaries, including Winston. The trust instrument contained this no contest clause:

"'The provisions of this Trust Agreement are in each case conditioned that the beneficiaries named in each case shall not, directly or indirectly, aid, counsel, commence, or prosecute any demands, claims, negotiations, suits, actions or proceedings; in any court of law, or other arenas, *having as an object*: [¶] 'A. The defeat in whole or in part of this Trust Agreement, or any provision or part thereof; or [¶] 'B. The obtaining for anyone of (i) anything of value from this Trust or my estate, (ii) any of the assets of this Trust or of my estate, or (iii) any assets in which I had an interest immediately prior to my death . . . .'" (*Poag, supra*, 195 Cal.App.3d at pp. 1166-1167, italics added.)

Winston subsequently pursued a number of legal proceedings arising from her relationship with Weingart, including claims against persons appointed as conservator of Weingart's person and estate, and, later, in a probate proceeding. In the course of these proceedings, Winston proffered documents (e.g., trust instruments, an agreement to make fifth codicil to Weingart's will, and a fifth codicil to Weingart's will), all of which seem

to have shown indications that they were either written or executed by Weingart. The various documents contained promises of such items as cash, bonds, jewelry and a residence on Hudson Avenue in Los Angeles. Eventually, Winston's claims were rejected, it seems for want of proper legal formalities. At some point, the trustees under Weingart's trust, who also had been involved to some extent or another in Winston's prior actions, filed a petition for a determination of Winston's rights under Weingart's trust. Specifically, whether she had violated the trust's no contest clause by her activities in the conservatorship and probate proceedings. The trial court ruled that Winston's activities did not violate the no contest clause in Weingart's trust. (*Poag, supra*, 195 Cal.App.3d at pp. 1165, 1167, 1172, 1181.) The trustees filed an appeal.

On appeal, Division One of our court affirmed. The court first interpreted the language of the no contest clause in Weingart's trust, focusing on the "limiting" language which provided that no one could bring a contest "*having as an object*" one of four listed objectives ("A" and "B," parts "(i), (ii) and (iii)," noted above). The court then found that Winston's activities in the conservatorship proceedings had asserted no claim to any asset of Weingart's trust, and had posed no threat to the trust, in whole or part, and thus, the activities did not constitute a "contest" under the language of the no contest clause. (*Poag, supra*, 195 Cal.App.3d at pp. 1175-1181.) As to Winston's claims in the probate proceedings, the court ruled that they had to be "characterized as an offer of additional purported testamentary documents, an action long recognized as falling outside the purview of a forfeiture clause, in that it seeks to establish rather than frustrate the testator's intent." (*Poag, supra*, 195 Cal.App.3d at p. 1182, citing *Estate of Lewy, supra*, 39 Cal.App.3d at p. 734.)

*Poag* is not helpful to Donald because the no contest clause in the Trust signed by Father and Mother did not have the same type of "limiting" language as was included in the trust instrument involved in *Poag*. In *Poag*, a person had to pursue some legal matter with *the object of obtaining trust assets* in order to violate the no contest clause, and this did not occur.

Here, in contrast, the no contest clause in the Trust signed by Father and Mother broadly provided that Donald and Edward, too would forfeit any right under the Trust by bringing a contest seeking to "set aside the Trust, or any of its provisions . . . ." The trial court found this happened when Donald proffered an amendment that was not real, and we agree. Donald tried to set aside the Trust's 50-50 split provisions by way of an amendment that he had no reason to believe was real, and to replace it with a "$100,000 first to Donald, then a 50-50 split." We read nothing in *Poag* which would preclude a finding that such actions fell within the reach of the language of the no contest clause involved in the current case. To the extent there is a difference between "seeking to set aside" a trust provision -- which would result in a forfeiture under the terms of the Trust here -- and "seeking to show an amendment" -- which may not have resulted in a forfeiture under a *Poag*-like analysis--, the difference is not important. It was established as fact that Donald did not seek to show an amendment because he had no reason to believe that that the piece of paper he offered as an amendment was truly an amendment. We do not have to say definitively what Donald was doing; we only have to say that what he was doing was not actually seeking to show a true amendment; he was misusing the probate court to gain a distribution advantage over his brother.

*Estate of Lewy, supra*, 39 Cal.App.3d 729, is also not helpful to Donald. *Lewy* is another decision by Division One of our court. In *Estate of Lewy*, the court ruled that when one person in good faith presents documents in an attempt to show that a second person had substituted pages in a will filed by the second person, the former is not asserting a contest of the will; the proceedings by the first person were not an attempt to interfere with the testator's testamentary plan, but rather, were an attempt to show the testator's true intent. (*Id*. at pp. 733-736.) Here, in contrast Donald did attempt to interfere with Mother's intent when he offered the amendment to the Trust purported signed by Mother, but which, in fact, she did not sign.

9

In *Watson*, *supra*, 177 Cal.App.3d 569, Division One of the Fourth District Court of Appeal reversed a ruling that two daughters had violated a no contest clause in their father's will. In *Watson*, the father's will left cash bequests to his two daughters, and the remainder of his estate to his wife. When wife died, her will provided for distribution of her estate to various beneficiaries, none of whom were the father's two daughters. The two daughters filed a creditor's claim in the wife's probate proceeding, claiming that the wife had entered an oral agreement promising the father that she would transfer assets to the two daughters. The creditor's claim in the wife's probate proceeding was rejected. (*Id*. at pp. 570-571.) The Court of Appeal ruled that the daughter's creditor's claim in the wife's probate proceedings had not violated the no contest clause in the father's will. In short, the two daughters' creditor's claim in the wife's probate proceeding did not have any effect on any property in the father's estate subject to disposition by his will. (*Id*. at pp. 574-575.)

We find *Watson* unhelpful to Donald here. We read nothing in *Watson* to support the proposition that offering a non-genuine amendment to a trust, with no basis to believe that the offered amendment is genuine, in an attempt to alter the settlor's expressly stated distributive intent in the trust, cannot — as a matter of law — be found to be a contest of the trust's distribution provisions.

### III.    The No Contest Clause Applies to the Survivor's Trust

Donald next contends the no contest clause involved in this case "would not apply to sub-trusts that came into existence after the original trust." We disagree.

Donald's argument is based on the language of the no contest clause. He argues there is no indication the no contest clause applied to sub-trusts that only come into existence after the first of Father or Mother to die. Edward argues Donald is wrong because he cannot point to a separate trust document that omitted a no contest clause. In addition, he claims there is nothing in the family trust document that excludes subsequent sub-trust from the no contest clause.

10

*Fazzi v. Klein* (2010) 190 Cal.App.4th 1280 (*Fazzi*) defeats Donald's argument. In *Fazzi*, spouses Lloyd and Norma created a family trust. Under the terms of the trust, on the death of either spouse, the survivor, as trustee, was to divide the trust assets into three trusts: Trust A, Trust B, and Trust C. The Trust directed the trustee, the surviving spouse, to place his or her share of the community property and his or her separate property into Trust A, and this trust would remain revocable during that spouse's lifetime. The trustee was to place into Trusts B and C, according to a specified formula, the decedent spouse's separate property and share of community property. The spouses had multiple children and stepchildren who were to be the remainder beneficiaries of Trusts B and C, which would become irrevocable trusts when the first spouse died. The surviving spouse was to be the income beneficiary of all three trusts until his or her death. (*Id*. at p. 1282.)

After father died, but before mother died, a child beneficiary, Christopher, filed a petition for a "safe harbor" determination that filing a proposed petition challenging mother's status and actions as trustees of the two trusts in which he was a beneficiary would not violate a no contest clause in the trust instrument. The proposed petition would also challenge a trust provision directing that Christopher's brother, Michael, serve as the successor trustee to mother. (*Fazzi, supra,* at p. 1282) The trial court entered a safe harbor order, ruling that Trusts B and C did not contain their own no contest clause, and did not refer to or incorporate the no contest clause in the original trust instrument. (*Id*. at p. 1284.)

The Court of Appeal reversed for the following reasons: "The rules for interpreting the scope of a 'no contest' clause are well-established. Where, as here, '[t]here is no conflict or question of credibility in the relevant extrinsic evidence[,] . . . interpretation of the trust is a question of law for our independent review. [Citation.] Although no contest clauses are enforceable and favored by the public policies of discouraging litigation and preserving the transferor's intent, they are nevertheless strictly construed and may not be extended beyond their plainly intended function. [Citations.]' . . . The key is to determine the intent of the trustors, Norma and

11

Lloyd. 'In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it.' [Citation.] [¶] Christopher's argument for interpreting the 'no contest' clause as inapplicable to Trusts B and C is beguilingly simple. He contends that because the Trust does not explicitly state the 'no contest' clause applies to the subtrusts, it must be strictly construed as applying only to the original trust. But such a construction not only ignores the trustors' intent as revealed in 'the whole of the trust,' it is also patently unreasonable. [¶] The trustors' intent that the 'no contest' clause applies to the subtrusts is implicit in the terms of the Trust. This document, a revocable instrument, created and funded the three subtrusts upon the first trustor's death. (Trust, ¶ 4.02(b).) At operation, Trusts B and C were irrevocable, and a host of provisions in the original trust immediately came into play, establishing rules for the administration of the subtrusts. For example, paragraph 4.02(b) directed that each of the subtrusts 'shall constitute and be held, administered and distributed by the Trustee as a separate Trust.' Paragraphs 4.04 and 4.05 established distribution rules for the assets and principal of Trusts B and C. Most importantly, for our purposes, paragraph 6.05 prohibited any beneficiary entitled to 'any distributions . . . or any benefits under this trust instrument' from 'contest[ing] in any court any of the provisions of this instrument.' Taken together, these provisions reveal the trustors' intent that the Trust should govern the trustee's administration of the subtrusts upon their creation and funding. [¶] This conclusion the 'no contest' clause applies to the subtrusts is the only reasonable construction of the clause. Because the original trust was revocable, a 'contest' was never a possibility during the joint life of the trustors. Only upon Lloyd's death, when the remainder beneficiaries gained their irrevocable interests in Trusts B and C, did the possibility of a 'contest' pose a risk to the trustors' plan for the assets they placed in trust. Ascertaining the intent of the trustors . . . from 'the whole of the trust instrument,' we conclude the 'no contest' clause applies to Trust B and C. [¶] *McIndoe v. Olivos* (2005) 132 Cal.App.4th 483 . . . (*McIndoe*) bolsters our conclusion. In *McIndoe*, the husband and wife trustors of a revocable family trust created and funded two separate trusts, a 'survivor's trust' and an

'exempt trust,' upon the death of the first spouse, a plan that differs from the Kleins' only in the number of subtrusts created, two rather than three. The McIndoe family trust, also like the Kleins', included a no contest clause that did not specifically state that it applied to the subtrusts. After the death of the first spouse in *McIndoe*, the surviving spouse repeatedly exercised her right to amend the revocable 'survivor's trust,' which held her separate property and share of the trustors' community property. These amendments favored one sibling beneficiary over the other, and when the surviving trustor died, the disadvantaged beneficiary challenged the amendments on the ground of undue influence. The disadvantaged beneficiary sought a safe harbor determination that her proposed contest to the heavily amended survivor's trust would not constitute a contest to the exempt trust. The court agreed, based on the terms of the original trust. [¶] Importantly for our purposes, the court in *McIndoe* affirmed that 'the no contest clause in the original trust applies to challenges to the original trust, the exempt trust and the survivor's trust,' even though the no contest clause there did not specifically state it applied to the subtrusts. (*McIndoe, supra,* 132 Cal.App.4th at p. 487.) The court stated, 'The no contest clause was located in the "general provisions" section of the trust document, which specified that all general provisions "apply to each trust established hereunder." . . . Because the no contest clause of the original trust applied to all subtrusts, there was no need to add a no contest clause to the exempt trust.' (*Id*. at p. 488.) [¶] . . . [T]he 'no contest' clause in the present case was . . . located in a . . . section of the Trust — article 6, entitled 'MISCELLANEOUS PROVISIONS.' (Trust, ¶¶ 6.01 to 6.06.) Though article 6 did not specify that its provisions applied to each subtrust, that intent was implied in the provisions themselves, and from the instrument as a whole, as explained above." (*Fazzi, supra*, 190 Cal.App.4th at pp. 1285-1286, fn. omitted.)

We agree completely with the reasoning expressed above, and find it applies to the current case. The language in the no contest clause in the Trust here, regularly referring to "this trust," plainly applies to the contemplated subtrusts as well. The subtrusts only existed pursuant to the original Trust. There are no separate trust instruments for the subtrusts. The subtrusts are governed by provisions in the Trust. Although the no contest

13

clause here was not segregated and included in section setting forth generally applicable terms of the Trust as in *McIndoe, supra,* 132 Cal.App.4th 483 ("general provisions") or *Fazzi, supra,* 190 Cal.App.4th 1280 ("miscellaneous provisions"), the plain language of the no contest clause here, in the context of the Trust as a whole, is susceptible of no other reasonable interpretation than that its reference to "this trust" referred to all of the trusts which were formed or which were to be formed under the terms of the single instrument.

## IV.     The New Law Applies

Donald claims "The 'new' no contest law was applied in this matter." Although we are not certain of Donald's point, it appears he may believe the trial court could not have found a contest under the old law. Assuming the implication in Donald's argument is that the probate court somehow erred by applying the "new" no contest law, when it should have applied the "old" no contest law, we find this incorrect and, in any event, too undeveloped to support reversal of the judgment.

In 2008, the Legislature enacted the "new" Probate Code law. (See Stats. 2008, ch. 174, § 1.) Under "new" Probate Code section 21315, subdivision (a), the "new" Probate Code law "applies to any instrument, whenever executed, that became irrevocable on or after January 1, 2001." Under "new" Probate Code section 21315, subdivision (b), the "new" Probate Code law "does not apply to an instrument that became irrevocable before January 1, 2001."

Father and Mother signed the Trust in 1995. Father died in 1996, at which time the irrevocable exemption trust and revocable survivor's trust came into place. Mother died in February 2007, making the survivor's trust irrevocable . Donald takes issue only with the Survivor's Trust. The new law applies to resolution of issues concerning the survivor's trust because it became irrevocable after January 1, 2001, the effective date of the new Probate Code law.

We also note that Donald  asserted in the trial court that the new Probate Code applied to his case.

14

**V.    There Was a No Contest Clause in the Trust**

Donald next contends the judgment enforcing the no contest clause must be reversed because the probate court erred in its application of the new Probate Code law. We disagree.

Donald tells us that new Probate Code section 21311, subdivision (a), defines what no contest clauses can be enforced, and that it allows a no contest clause to be enforced against "(1) a direct contest that is brought without probable clause." This is correct. Donald tells us that a "direct contest" is defined in new Probate Code section 21310, subdivision (b), to mean: "[A] contest that alleges *invalidity of a protected instrument or one or more of its terms*, based on one or more of the following grounds: . . . [¶] (5) . . . [R]evocation of a trust pursuant to Section 15401 . . . ." (Italics added.) Finally, Donald tells us that new Probate Code section 21310, subdivision (e), defines a "protected instrument" to mean an instrument "that contains the no contest clause" and or an instrument "that is in existence on the date the instrument containing the no context clause is executed and is expressly identified in the no context clause . . . ." (Prob. Code, § 21310, subds. (e)(1), (e)(2).)

Donald claims that because the offered amendment itself did not have a no contest clause, it was not a "protected instrument." We agree. Donald next implies that there could be no finding —as a matter of law— as to any any contest issue because the offered amendment was not a protected instrument. What Donald fails to realize is that the no contest clause which was enforced was the one in the Trust. Beyond this, we find his argument too vague and undeveloped to support reversal of the judgment.

**VI.    Revocation**

Donald contends the probate court erred in ruling that the offered amendment was an attempted partial revocation of the Trust, which invoked the no contest clause. We disagree.

15

As noted above, Probate Code section 21310, subdivision (b)(5), defines a "direct contest" to include a contest alleging the invalidity of a protected instrument (that is, an instrument with a no contest clause), "*or one or more of its terms*," based on the ground of a "revocation of [the] trust pursuant to Section 15401." Under Probate Code section 15401, a trust that is revocable by the settler may be revoked in whole or in part by any one of listed methods, including by a "writing (other than a will) signed by the settler and delivered to the trustee during the lifetime of the settler. . . ." When Donald attempted to offer the amendment to the Trust, he was alleging that a term in the Trust was invalid because it had been revoked and replaced with a new and different term.

Donald contends only a "full attack" on the trust that seeks to make the instrument a nullity can bring the no contest clause in the Trust into play. He contends that the Trust "distinguished between a revocation and an amendment," and the Trust does not indicate that an amendment has the effect of partial revocation. Finally, Donald claims that even if the no contest clause can be construed such that an amendment is considered a partial revocation, "the case law does not support doing so in this case."

We adopt the probate court's reasoning on this issue: "[Donald] . . . asserts that his prior petition could not qualify as an attempt to invalidate the protected instrument [i.e., the Trust] on the grounds of revocation but rather constituted a mere amendment. Although no case law was provided directly on point, and the court was unable to find any, there are cases which have suggested that a trust amendment can affect a revocation. (See *Ike v.Doolittle* (1998) 61 Cal.App.4th 51, 75 . . . ; *Heifetz v. Bank of America Nat. Trust and Savings Assoc*. (1957) 147 Cal.App.2d 776, 780 . . . (noting that the trial court below held a settlor's amendment had revoked a paragraph of her trust).) In *Ike*, the [Court of Appeal] examined a poorly drafted, ambiguous trust instrument. . . . The court addressed whether or not an amendment to the pertinent flawed provision implicitly revoked the trust's intestacy provision. The court eventually concluded the amendment was too ambiguous to be found to have revoked that provision. ([*Ike, supra*, 61 Cal.App.4th at p. 75].) Here, [Donald] presented the court with a purported amendment which would have increased his share by $100,000. Although, as pointed by

16

[Donald]'s counsel, Article Third of the survivor's trust includes words referring to both 'amendment' as well as 'revocation,' the context and a reasonable interpretation would not indicate that an amendment and a partial revocation would be mutually exclusive. In other words, there is no practical distinction between these terms given the facts. Further, the [purported] amendment clearly affected the survivor's trust distribution scheme and, if validated, regardless of whether or not titled an 'amendment,' would have constituted a revocation of [Mother]'s intended estate plan."  We agree.

## VII.    Public Policy

Donald contends the no contest clause in the Trust "is invalid as against the public policy of the State of California."  Not so under the circumstances of this case.

Donald argues that the public policy of this state — as expressed in one version or another of the Probate Code and or in the state's common law — allows for many types of proceedings to be initiated and litigated without constituting a contest of a testamentary instrument.  In short, Donald argues that because the no contest clause formed the basis for the forfeiture imposed as to him, it violated some public policy protecting the actions he took in the underlying proceeding to determine the validity of the amendment to the Trust that he offered.

Donald's reliance on *Estate of Parrette* (1985) 165 Cal.App.3d 157 in support of his argument is misplaced.  In *Parrette*, the Court of Appeal ruled that a no contest clause which provided that a trustee was not subject to the jurisdiction of any California court violated public policy.  (*Id*. at pp. 161-162.)  We simply do not see the no contest clause in the current case to be of a nature similar to the one involved in *Parrette*.  We agree in the abstract that an attempt to defeat our state courts from exercising jurisdiction may be a matter implicating public policy.  That is not what the no contest clause in the current case attempted to do.

Similarly, Donald's reliance on *Estate of Ferber* (1998) 66 Cal.App.4th 244 does not support his claim.  In *Ferber*, the Court of Appeal ruled that a no contest clause which provided that actions to remove fiduciaries, or to restrict objections to accounts, were restricted unless they were deemed frivolous and violated public policy.  (*Id*. at

17

p. 255.)  We fail to see the no contest clause in the current case as being of the same nature as the no contest clause in *Ferber*.  We agree in the abstract that public policy should disfavor an attempt to restrict actions aimed at breach of fiduciary duty, or the accuracy of accounts.  That is not what the no contest clause in the current case attempted to do.

In the current case, the no contest clause allowed for forfeiture for offering an amendment to a trust purportedly signed by a settler, knowing the amendment was not, in fact, signed by the settler.  Donald cites no legal authority supporting the proposition that public policy should not condone such a no contest clause.

## DISPOSITION

The probate court's judgment dated October 21, 2011, enforcing the no contest clause in the Trust, and awarding all Trust assets to Edward Bellezzo, is affirmed.  Respondent is awarded costs on appeal.


BIGELOW, P. J.

We concur:


FLIER, J.


GRIMES, J.


18