Filed 12/29/14  Crowe v. Tweten CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| NANCY CROWE et al., | |
| Plaintiffs, Cross-defendants and Appellants, | E056920 |
| | (Super.Ct.No. INP10000515) |
| v. | OPINION |
| LEONARD M. TWETEN, | |
| Objector, Cross-complainant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  James A. Cox, Judge.

Affirmed.

Smyth & Mason, Jeffrey A. Smyth; Loeb & Loeb and Adam F. Streisand for

Plaintiffs, Cross-defendants and Appellants.

Greines, Martin, Stein & Richland, Robin Meadow, Cynthia E. Tobisman and

Jeffrey E. Raskin; Bingham McCutchen, Marshall B. Grossman and Karen Ho;

1

Ervin Cohen & Jessup, Rodney C. Lee and Jeffrey A. Merriam-Rehwald for Objector, Cross-complainant and Respondent.

Plaintiffs, cross-defendants and appellants Nancy Crowe and Janet Houston, beneficiaries of a trust created in 2008 by their parents, Leonard M. and Eileen Tweten, appeal from a judgment reforming that trust. They contend the trial court erred in reforming and/or modifying the trust to include language requiring the federal estate tax exemption for 2009 apply in the event that either of the Twetens died in 2010. We reject their contentions and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

Objector, cross-complainant and respondent, Leonard M. Tweten, and his wife, Eileen, had four children: Jim, Scott, Nancy and Janet.[1] Originally the Twetens lived in Seattle, where they built and managed a chain of audio/video stores that employed each of their children. In 2002, they sold the business to Best Buy for approximately $90 million. Prior to and after the sale of the business, the Twetens were generous to their children and grandchildren; they bought homes, paid for schools and cars, paid bills and provided other gifts. Each family member was a stockholder in the business, and plaintiffs each received $6 million from its sale. After selling the business, the Twetens moved to Palm Desert.

Since 1991, the Twetens had a single estate planning priority, i.e., they consistently structured their estate so that the surviving spouse would inherit the deceased

---

[1] Because of the family relationship of the parties, we adopt their practice and refer to the Tweten family by their first names. No disrespect is intended.

spouse's share, and the children would inherit the bulk of the estate upon the death of the surviving spouse. In 1991, the reciprocal wills of the Twetens stated their "primary purpose" was to provide for the surviving spouse: "The primary purpose and intent in creating this Trust [created by wills] is to provide a flexible plan for the financial security of my spouse and to enable my spouse to continue, within the limitations of the funds available, the standard of living to which my spouse has become accustomed. The rights and interests of beneficiaries and/or remaindermen to residual or remainder interests are subordinate and incidental to that purpose. The provisions of this Trust shall be liberally construed in the interest and for the benefit of my spouse."

In 2007 and 2008, the Twetens, with the assistance of their financial advisors, the McCutchen Group,[2] and estate planning attorney Joseph Hahn of Best, Best, & Krieger, discussed their estate plan, which led to the creation of their "2008 LET Revocable Trust" (Trust). From September 20, 2007, through January 2008, the Twetens met several times with Matthew McCutchen, Marty Nelson, and/or Joseph Hahn. At each meeting, they made clear that "when the first spouse died they wanted to have all of the assets available to the surviving spouse." They never said they wanted the maximum tax-free amount to go to the children at the first spouse's death. The only issue on which the Twetens differed was how their separate shares would be distributed upon both of their deaths. Leonard wanted a portion of his share to go to a charitable foundation and the balance to go to the children in trust with limited annual payments. Eileen wanted her

---

[2] Matthew McCutchen and Marty Nelson of the McCutchen Group assisted the Twetens with their financial and estate planning.

3

share to go to the children directly and nothing to charity.**3** McCutchen suggested a "token gift" to the children when the first spouse died, to signify "love and appreciation," and to let the children know they "'are going to have to wait until the second spouse dies'" to inherit the balance of the estate." The Twetens liked this idea.

In subsequent meetings, the Twetens consistently reaffirmed their intention that the surviving spouse would inherit from the first spouse to die, no part of the deceased spouse's share would go outright to the children other than a "token" gift free of estate tax, and at the death of the surviving spouse, the children would inherit in trust (as to most of Leonard's share) and outright (as to Eileen's share). The couple signed a "placeholder trust" so that they could "begin funding the trust prior to the operative document being finalized," and Hahn set about drafting their detailed plan. The placeholder trust stated that the Twetens were the "primary beneficiaries" and that so long as one of them lived, "the survivor of us will have the exclusive right to the use and benefit of the income and the assets of this trust."

In January 2008, the McCutchen Group reconfirmed the estate planning intentions of the Twetens by sending them an email with questions about their wishes. Leonard handwrote the answers of the Twetens on a printout of the email, and then the McCutchen Group forwarded that marked-up email to Hahn. The email stated: "The Marital Trust will hold the majority of assets from the first estate." It also stated that upon the death of the surviving spouse, the Tweten trust would create a trust for Scott in

---

**3** While the Twetens did not agree on the final distribution of their assets, neither tried to influence the other to change his or her position.

4

the amount of $4 million, with $10,000 monthly payments. Because Scott had a substance abuse problem and did not handle his financial affairs well, the Twetens wanted to construct a plan that would provide for him but at the same time prevent him from ever receiving a large amount of money outright. The Twetens did not want Scott to receive the same full outright share as the other children at any point in time because "they both felt that giving him additional money due to his health issues would go ahead and just basically potentially kill him."[4]

Hahn drafted the Trust consistent with the wishes of the Twetens. In addition to preparing the Trust, Hahn created two diagrams to show the Twetens "how the trust would operate in graphical terms, rather than just putting the trust document in front of them and expecting them to be able to digest the technical, legal language of it." (See Exhibit No. 1 (diagrams) attached to this opinion.) According to the diagrams, at the death of the first spouse, the Tweten estate would be split in half (two estimated $50 million community property shares); a small amount from the deceased spouse's share (shown on the diagram as $1 million) would be divided equally among the four children via a "family trust" and would be distributed to them immediately. If Eileen died first, a small amount would be divided equally among the four children and the remainder of her share ($49 million) would be held in a "marital trust" for Leonard's benefit; if Leonard died first, a small amount would be divided equally among the four children, then $5 million would go to a foundation, and the remainder of his share ($44 million) would be

---

[4] Scott suffered from alcoholism, which caused his death in 2010.

5

held in a marital trust for Eileen's benefit. The surviving spouse would receive the income from the marital trust and also would have access to the principal for specified purposes. Only at the death of the surviving spouse would the estate be distributed to the children. And even after the death of the surviving spouse, Leonard's share would pass to the children in trust. Under no circumstances would Scott inherit his share of the trust outright.

In discussing the formula clause, which would be used to determine the amount that would go into the family trust, with the remainder going into the marital trust, Hahn told the Twetens about the Federal Estate Tax (FET) exemption amount in 2008 ($2 million) and what it was scheduled to be in 2009 ($3.5 million). They also discussed the possibility that it would be $1 million in 2011. While Hahn knew the FET was slated to expire in 2010 (i.e, the FET exemption amount would be 100 percent), he did not believe he told the Twetens what would happen with respect to the marital trust if there was no FET. Basically, with no FET, the entire estate of the deceased spouse would be paid to the four children outright via the family trust and the surviving spouse would be disinherited from half of the joint wealth. In discussing the applicable FET exemption for 2010, Hahn told the Twetens, "if we got to a situation in 2010 where Congress had failed to act [then we would] need to revisit the situation." Hahn opined that the Twetens never understood the ramifications of the potential absence of an FET in 2010; however, he believed they understood the need to amend the Trust in the event of no FET.

Hahn did not draft the Trust to accommodate the unlikely possibility that Congress would fail to enact an FET for 2010, because he assumed that Congress would enact an

6

FET for 2010. He thought the chance of there being no FET in 2010 was "so remote that it was almost inconceivable." Hahn was not the only one to think this way. Additionally, the computer program he used, "Pro doc," did not contain a "savings clause" option; rather, Pro doc added it in 2009. The absence of an FET in 2010 resulted in the formula clause in the Trust operating inconsistently with the intent of the Twetens. Contrary to their wishes, in 2010 alone, the formula clause "would have disinherited the surviving spouse of half the marital trust assets . . . distributed a huge amount of money to Scott outright," and would have "distribute[d] the money to the four children without trust provisions." Had Hahn known that Congress was too dysfunctional to enact an FET for 2010, he would have acted differently.

In early April 2010, Leonard informed McCutchen that Scott had passed away and that Eileen had been discharged from the hospital on hospice care. McCutchen expressed his concern that the Tweten assets could be distributed in a manner contrary to their wishes. In reviewing the Trust, McCutchen determined it should be amended to ensure that it effectuated the consistent intent of the Twetens to leave only a token amount to the children upon the death of the first spouse, and the bulk of the deceased spouse's share to a marital trust for the surviving spouse's benefit. McCutchen called Hahn; however, he was unable to reach Hahn because Hahn was on vacation. Instead, McCutchen was put in contact with another attorney at Best, Best & Krieger, David Erwin. About the same time, on April 14, 2010, Leonard emailed McCutchen to confirm that when Eileen passed away her estate would go directly to him first, and then when he died, the children would

7

receive the estate.  McCutchen responded via email that the McCutchen Group would call Leonard in 30 to 45 minutes.

On April 14, 2010, McCutchen and Erwin went to the Tweten home in Palm Desert.  Leonard, McCutchen and Erwin discussed the current state of the FET and the purpose of the amendment Erwin had prepared (Amendment).  Erwin explained that the Amendment ensured that Eileen's wishes were carried out by directing everyone to "[r]ead the trust as if this was a 2009 trust so that it wasn't 2010 with no [FET]."  The Amendment provides in part:  "This Trust during the year 2010 in the event of death of one of Grantors is amended throughout to provide distribution, administration and allocation based upon the Federal Estate and Generation-Skipping Transfer tax law as the same existed and would have been applicable to estate of decedents dying during the year 2009."[5]  Leonard acknowledged that he understood the Amendment and signed it.

When Eileen's caregiver told the men that Eileen could see them, they went into her bedroom, where they found her awake and alert.  Erwin described the Amendment to Eileen, explaining that it was intended to carry out her intent under the Trust.  Leonard also told Eileen that the Amendment was to carry out their estate planning intent.  Eileen said she understood and signed the Amendment.  However, neither Leonard's nor Eileen's signature was notarized.  Eileen died on April 26, 2010.[6]

---

[5] Hahn opined that the Amendment was consistent with the Tweten estate planning intentions.

[6] Leonard testified that in April 2010, he lost a son, a brother, his wife, and "two beloved dogs."

On September 10, 2010, plaintiffs filed a petition to invalidate the Amendment on multiple grounds, including fraud, undue influence, forgery, lack of capacity, and invalidity, because the signatures were not notarized. Challenging the validity of the Amendment, plaintiffs claimed that because there was no FET in 2010, the "entire Deceased Grantor's Share" must pass to them outright. Jim did not join his sisters' petition.

Leonard also petitioned the court, requesting that if the Amendment is found not to comply with the Trust's terms, that the court excuse the noncompliance with the notarization requirements or, in the alternative, "modify the provisions of the Trust to provide that Eileen's share of the Trust be divided following her death so that the Family Trust be funded with $2,500,000 and the residue of Eileen's property be funded into the Marital Trust." Leonard requested that the Trust be reformed.

Pursuant to the parties' stipulation, the two petitions were tried together. Following a bench trial, the court issued a detailed tentative decision wherein it found in favor of Leonard and against plaintiffs. The trial court observed "the evidence is most convincing that the trust failed to comply with the settlor's intended distributions upon the death of either settlor if such death happened to occur in the year 2010." Because the Trust required that any amendment be executed by both Twetens and that their signatures be notarized, the court concluded that current case law barred it from enforcing the Amendment. (*King v. Lynch* (2012) 204 Cal.App.4th 1186, 1193.) However, using its equitable power, the court reformed and, alternatively, modified the Trust to give effect to the consistent intent of the Twetens "that the trust provide a marital trust for the use of

9

the survivor." The court stated: "Whether by modification or reformation, the trust is ordered modified/reformed by the addition of language as specified in the Amendment to Declaration of Trust (determined to be invalid by failure of notarization) which was executed by the Settlors on April 14, 2010. The court finds that such language, approved and adopted by the Settlors themselves, constitutes and implements their true intent." Judgment was entered on August 7, 2012.

## II. DISCUSSION

Plaintiffs agree the trial court correctly concluded the Amendment was invalid and ineffective in amending the Trust because the signatures of the Twetens were not notarized pursuant to the Trust's requirement. (*King v. Lynch*, *supra*, 204 Cal.App.4th at p. 1193.) However, plaintiffs contend the trial court erred in reforming and modifying the Trust to add the language in the Amendment.

### A. California Courts Can Reform a Trust to Correct a Drafting Error

"Civil Code section 3399 recognizes the equitable common law power of a trial court to reform a trust agreement based on mistake, but not to create a new trust agreement under the theory of reformation. [Citation.]" (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 85 (*Ike*).) Civil Code section 3399 provides: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith, and for value." Thus, "[a] reformation action lies when a written instrument does not accurately

10

reflect the oral understanding which gave rise to it. [Citation.]" (*Getty v. Getty* (1986) 187 Cal.App.3d 1159, 1178.) "The sole purpose of the reformation doctrine is to correct a written instrument in order to effectuate a common intention of the parties which was incorrectly reduced to writing. [Citation.]" (*Ibid*.) A trust agreement may be reformed upon clear and convincing evidence that the agreement fails to express the intent of the parties because of a mistake as to the contents or effect of its writing. (*Dictor v. David & Simon, Inc.* (2003) 106 Cal.App.4th 238, 253.)

In 1986, the Legislature revised the Probate Code and "codified the common law equitable power of trial courts to modify the terms of a trust instrument where such modification is necessary to serve the original intentions of the trustors. [Citation.]" (*Ike*, *supra*, 61 Cal.App.4th at p. 83.) However, the sections enacted do not provide the exclusive means to do so. Rather, "the broader equitable power of trial courts to modify or reform a trust is preserved by operation of [Probate Code] section 15002, which expressly provides: 'Except to the extent that the common law rules governing trusts are modified by statute, the common law as to trusts is the law of this state.'" (*Ike*, *supra*, at p. 84.) In *Ike*, the appellate court concluded that a trial court has "equitable power, founded in common law . . . to modify [a] Trust provided (1) a 'peculiar' or 'exceptional' circumstance [makes] modification necessary to accomplish the purpose of the trustors, and (2) there [is] some expression in the trust instrument of the purpose of the trustors. . . . [A] drafting error in a trust instrument which renders ambiguous an expression contained therein regarding the administrative or distributive intentions of the trustor(s) constitutes a 'peculiar' or 'exceptional' circumstance . . . which may justify an

11

equitable modification of a trust instrument to accomplish the purpose of the trustor(s)." (*Id*. at p. 83; see also *Giammarrusco v. Simon* (2009) 171 Cal.App.4th 1586, 1603 ["'If, due to a mistake, the trust does not contain the terms that were intended by the settlor, the settlor or other interested party may maintain a suit in equity to have the instrument *reformed* so that it will contain the terms that were actually agreed upon or that reflect the testator's actual intent. The more common type of . . . error, which may be made by the settlor or the scrivener, is a drafting error that is referred to as a mistake in expression.'"].)

### B.  Standard of Review

"[E]xtrinsic evidence as to the circumstances under which a written instrument was made is '"admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible" [citation], and it is the instrument itself that must be given effect. [Citations.]' [Citation.] . . . [A]n ambiguity is said to exist when, in the light of the circumstances surrounding the execution of an instrument, 'the written language is fairly susceptible of two or more constructions.' [Citations.]" (*In re Estate of Russell* (1968) 69 Cal.2d 200, 211, fn. omitted; see also *Ike*, *supra*, 61 Cal.App.4th at pp. 73-74.)  "On appellate review, the trial court's threshold determination of ambiguity is a question of law [citation] and is thus subject to our independent review [citation]." (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554-555; see also *Ike*, *supra*, at pp. 74-75.)

## C. Analysis

"Where a trust instrument contains some expression of the trustor's intention, but as a result of a drafting error that expression is made ambiguous, a trial court may admit and consider extrinsic evidence, including the drafter's testimony, to resolve the ambiguity and give effect to the trustor's intention as expressed in the trust instrument." (*Ike*, *supra*, 61 Cal.App.4th at p. 74; see also *Giammarrusco v. Simon*, *supra*, 171 Cal.App.4th at p. 1605; Prob. Code, § 21102.)

Here, the Twetens created the Trust in 2008. The language at issue is located under article II, section G, entitled "INITIAL REVOCABLE TRUST." Section G provides in part: "<u>Distribution Upon Termination</u>. Following the death of the deceased Grantor . . . the Trustee shall divide the deceased Grantor's share into two shares, with one share known as the 'Marital Trust Share' and the other share known as the 'Family Trust Share.' The Marital Trust Share shall consist of a fractional share of the residue of the deceased Grantor's estate with (1) the numerator of such fraction equaling the maximum Federal estate tax marital deduction allowable to the deceased Grantor's estate diminished by the value for Federal estate tax purposes of all other items in the deceased Grantor's gross estate which qualify for the marital deduction and which pass or have passed to the surviving Grantor under other provision of this Declaration of Trust or otherwise; provided, however, such amount shall be reduced by an amount, if any, needed to increase the deceased Grantor's taxable estate to the largest amount which, after taking into account all other deductions allowed to the deceased Grantor's estate for Federal tax purposes and all allowable credits, will result in the least amount of Federal

13

estate tax being imposed on the deceased Grantor's estate; and (2) the denominator of such fraction equaling the value of the deceased Grantor's share. . . ."

According to the above language, at the death of the first spouse, the Tweten estate would be split in half; a small amount (equal to the value of the FET exemption) from the deceased spouse's share would be divided equally among the children via a family trust and would be distributed to them immediately; if Eileen died first, a small amount ($2 million in 2008 and $3.5 million in 2009) would be divided between the four children and the remainder of her share would be held in a marital trust for Leonard's benefit; if Leonard died first, a small amount ($2 million in 2008 and $3.5 million in 2009) would be divided between the four children, $5 million would go to a foundation, and the remainder of his share would be held in a marital trust for Eileen's benefit. Upon the surviving spouse's death, the assets of the Trust would be distributed to the children. (Exhibit No. 1.)

Viewed in isolation from the other Trust provisions, article II, section G is not patently ambiguous. However, article II, section G cannot be viewed in isolation from other trust provisions. "All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole. If the meaning of any part of an instrument is ambiguous or doubtful, it may be explained by any reference to or recital of that part in another part of the instrument." (Prob. Code, § 21121; see also *Ike*, *supra*, 61 Cal.App.4th at p. 73 ["'In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it'"].) Viewing the Trust as a whole, along with the absence of an FET in 2010, the

14

language in article II, section G, presents a mistake because in the year 2010, none of the deceased spouse's share would go into the marital trust in contradiction of the intent of the Twetens.

In drafting the Trust, both the Twetens and their counsel anticipated the existence of an FET exemption, because the formula for calculating how much would go into the family trust, which the children would receive directly upon the death of the first spouse, was based on the FET exemption. They further anticipated the majority of the deceased spouse's share would go into a marital trust to provide for the surviving spouse until his or her death. A disconnect between the language of the Trust and the intent of the Twetens arose only in 2010 when there was no FET. In the absence of an FET, the entire share of the deceased spouse would go into the family trust for immediate distribution to the children, leaving nothing to be deposited in the marital trust. However, such distribution contradicts other portions of the Trust. For example, there was no provision in the Trust that would allow one of the Tweten children, Scott, to inherit a large, lump sum of money. Rather, language in the Trust created a trust that would provide monthly income to Scott, ensuring that he never received a large, lump sum of money from Eileen's share. Contrary to this language, the absence of an FET in 2010 would have resulted in Scott receiving a large, lump sum of money upon the death of the first spouse. Such distribution was against the wishes of the Twetens, who feared that if Scott possessed such a large sum of money, it would result in his death because of his addictions. Also, the Trust anticipated the majority of the deceased spouse's share going into a marital trust; otherwise, article VI is superfluous. Thus, during the year 2010, the

15

language in the Trust concerning distribution of the deceased spouse's share was internally contradictory, and contrary to the intent of the Twetens.

In order to resolve this problem, the trial court considered the Tweten will, which was created in 1991, along with the testimonies of Leonard, the attorneys, and financial advisors responsible for drafting the Trust. This extrinsic evidence provided clear and unambiguous evidence of the intent of the Twetens. According to both McCutchen and Hahn, it was consistent with the wishes of the Twetens that "when the first spouse died they wanted to have all of the assets available to the surviving spouse." Hahn was aware of the absence of an FET for 2010, but failed to fully explain to the Twetens what such absence meant because he thought the chance of there being no FET in 2010 was "so remote that it was almost inconceivable." While Hahn informed the Twetens they may need to revisit the Trust in the future, he did not explain why. He further testified that the computer program he used, Pro doc, did not contain a "savings clause" option in the event of no FET; rather, Pro doc added it in 2009. Hahn's testimony alone establishes drafting errors that resulted in the Trust not accomplishing what the Twetens intended. (*Ike*, *supra*, 61 Cal.App.4th at pp. 67-68.) Nonetheless, further evidence of the intent of the Twetens was presented through their 1991 will, the Amendment, Leonard's testimony, and the testimonies of the financial planners for the Twetens, all affirming the desire of the Twetens to have all of their assets available to the surviving spouse.

Accordingly, exercising our independent review, we conclude that the Trust suffers from a drafting error that failed to account for the absence of an FET in 2010 and therefore failed to express the intent of the Twetens accurately. Extrinsic evidence

16

established their intent to have all of their assets available to the surviving spouse on the death of the first spouse. Because of the absence of an FET in 2010, the Trust failed to carry out the wishes of the Twetens in that year only. Under these circumstances, the trial court correctly reformed the Trust to include the language in the Amendment.[7]

### III. DISPOSITION

The judgment is affirmed. Respondent shall recover his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

MILLER
J.

---

[7] Assuming we would agree that the trial court erred in reforming the Trust, plaintiffs contend that the court also erred in modifying the Trust. However, having concluded the court correctly reformed the Trust, we need not reach this contention.

17



MCC 00624

548

**EXHIBIT NO. 1**

18



MCC 00625

549

19